[No. 17633–1–I.   Division One.   October 5, 1987.]

RILEY W. PLEAS, ET AL, *Respondents*, v. THE CITY OF SEATTLE, *Appellant.*

---

[9]The result would be the same under these facts if the officers believed a felony was being committed.

*Douglas N. Jewett, City Attorney, Gordon F. Crandall, Senior Assistant,* and *Philip Mortenson, Assistant,* for appellant.

*Jerry W. Spoonemore, John Blankinship,* and *Montgomery, Purdue, Blankinship & Austin,* for respondents.

*Peter T. Jenkins* and *Riley J. Atkins* on behalf of Washington Environmental Council, amici curiae.

STEWART, J.*—The City of Seattle appeals a judgment of $969,468.09 entered against it in connection with the intentional delay of a construction project. We reverse on the grounds: (1) intentional interference with prospective economic advantage was not proved, and (2) even if it was, proximate cause was not established. The developer, Parkridge, cross–appeals the failure to award it an additional

---

*This appeal was heard by a Court of Appeals Judge, together with a Supreme Court Justice and a Superior Court Judge sitting as Court of Appeals Judges Pro Tempore in Division One.

$155,240 for the City's refusal to permit a modification to the project after construction began. We affirm the cross appeal, on the ground Parkridge has failed to cite any authority to support its contention.

This case is a continuation of *Parkridge v. Seattle,* 89 Wn.2d 454, 573 P.2d 359 (1978). The facts as found in that case are binding here. *King v. Seattle,* 84 Wn.2d 239, 525 P.2d 228 (1974). Therefore much of the following summary of the facts is taken from *Parkridge v. Seattle, supra.* In addition, unchallenged findings in this action are verities on appeal. *Davis v. Department of Labor & Indus.,* 94 Wn.2d 119, 615 P.2d 1279 (1980). The remaining facts, although challenged by the City, are supported by substantial evidence. *See Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

In 1966 and 1967, Parkridge purchased eight lots and two half lots near Volunteer Park on Capitol Hill in Seattle. The lots had been zoned to permit apartment construction since 1959, and in 1964 a consultant had recommended the lots to the city planning commission as suitable for high-rise apartments.

In the early 1970's, neighborhood activists formed the Capitol Hill Community Council (CHCC) and the Capitol Hill Land Use Review Board (CHLURB). They requested the City to give them special notice of any permit applications for any potential development in the neighborhood. The Mayor at that time directed the superintendent of buildings to accommodate them. Prior to that time, there was no written notice procedure for interested citizens in place at the Building Department.[1]

---

[1]Amici takes issue with the trial court's findings regarding "favoritism" by the City toward the citizens opposed to Parkridge. We will not consider amici's contention for several reasons. First, the purpose of an amici brief is to help the court with points of law and not to reargue the facts. *See* RAP 10.3(e) (limiting the content of an amici brief to the *issues* of concern to amici). Second, the City would be collaterally estopped from raising that issue by a specific finding made in the prior litigation. Amici should not be permitted to litigate a factual matter prohibited to a party. Third, we do not consider issues raised solely by amici. *Schuster v. Schuster,* 90 Wn.2d 626, 585 P.2d 130 (1978).

There were nine houses on the Parkridge lots. The houses were in a dilapidated condition, and some had been made into duplexes or triplexes. In 1973, the City cited Parkridge for various housing and zoning code violations in connection with the houses, and ordered Parkridge to repair the residences or close them and secure them from unlawful entry.

In December 1973, Parkridge applied for a demolition permit for one of the houses. The City notified CHLURB of Parkridge's application for a demolition permit. Certain neighbors were strongly opposed to development of an apartment house, preferring that Parkridge either renovate the existing houses or construct town houses on the property. An employee of the Mayor's office who was also a member of the CHCC executive board met with the superintendent of buildings. They agreed that the City would require Parkridge to complete an environmental impact statement (EIS). This agreement to require an EIS bypassed the normal procedure of the City under the State Environmental Policy Act of 1971 (SEPA).[2]

The City refused to issue the demolition permit on the grounds that it was the first step in the construction of an apartment house, that an EIS might be required as a condition to building permit approval, and that to allow demolition before an EIS was prepared would restrict the available alternatives to the proposed development. The City requested Parkridge to provide environmental information and to respond to specific concerns of persons living in the vicinity. It was the usual practice of the Building Department to ask permit applicants to respond to community concerns. However, the City also requested certain environmental data not customarily required of permit applicants.

During the same time period, some of the CHCC officers

---

[2]The usual procedure included consideration of a checklist, a visit to the site by the staff, and staff review, culminating in a declaration of either significance or nonsignificance.

met with the chairman of the City Council Planning Committee at the time, who encouraged them to petition for a down zone of the property to single family residential. The petition for down zoning was filed January 4, 1974, and the City Council approved it in June 1974.

While the down zone was pending, Parkridge abandoned its demolition permit application and, in February 1974, applied for a permit to construct an apartment house. In April 1974, again bypassing the usual procedure for an EIS, the superintendent of buildings requested data for the preparation of an EIS for the proposed structure. The request included items not customarily required of applicants for building permits of similar structures. Parkridge did not appeal the EIS requirement, but instead employed an environmental consultant suggested by the City to assemble and submit the information requested.

The Building Department canceled the building permit application in January 1975, believing 6 months had elapsed without any action on the application, and that Parkridge did not have a vested right to the former zoning. Parkridge then brought a mandamus action to compel continued processing of the building permit application. That action was consolidated with an action to declare the rezone void.

In June 1975, the trial court ruled that the rezone was "unreasonable, arbitrary and capricious," therefore it was void. The court also ruled that the City's refusal to continue processing the permit application and its purported cancellation of the application was "unsupported either in fact or by law and accordingly was improper." The court ordered the City to continue processing the building permit application "promptly and diligently and in good faith." The Supreme Court affirmed in January 1978 and the remittitur was issued in March 1978. *See Parkridge v. Seattle, supra.*

While the appeal was pending in *Parkridge v. Seattle, supra,* Parkridge continued to seek demolition permits without being required to provide an EIS. Parkridge sought

an order holding the superintendent of buildings in contempt for his refusal to comply with the June 1975 judgment. The superior court denied Parkridge's request for a contempt order in August 1976, on the ground the appeal had superseded the judgment. No appeal was taken from this order.

The Supreme Court stated in *Parkridge v. Seattle, supra* at 466:

> The State Environmental Policy Act of 1971 and the other statutes and ordinances administered by the building department serve legitimate functions, none of which is intended for use by a governmental agency to block the construction of projects, merely because they are unpopular. We make this statement in light of the history of this matter and because the building permit application will be before the building department for further processing.

Parkridge apparently believed this admonition meant it did not need to submit data for an EIS as a prerequisite to obtaining demolition permits for the houses. The City, on the other hand, continued to assert that an EIS was required because demolition of the houses was merely the first step toward development of an apartment house. The City also notified Parkridge that the EIS prepared in 1974 was now outdated and would need to be redone in accordance with the amendments to SEPA enacted after 1974.

Parkridge did not appeal the requirement of a new EIS for the building permit. Again, it hired one of the environmental consultants suggested by the City. However, Parkridge continued to press for a demolition permit without an EIS.

In October 1978, Parkridge moved in the mandamus case for an order compelling the City to issue immediately, and without the requirement of an EIS, permits for the demolition of the nine houses. The superior court denied the motion; Parkridge did not appeal.

In May 1980, the City issued a draft EIS based upon the information provided by Parkridge's consultant. A public hearing on the draft was held that month and the final EIS

was issued in April 1981. In April 1982, the Department of Construction and Land Use (formerly Building Department) issued its decision, concluding that the master use permit for a 50–unit apartment building should be granted. During this time, Parkridge did not seek any court action to expedite the matter.

CHCC filed a notice of appeal from the decision to issue the master use permit. CHCC then negotiated a settlement with Parkridge, whereby Parkridge agreed to rehabilitate instead of demolish one of the nine houses. CHCC agreed in return to withdraw its appeal and to help Parkridge obtain the necessary variance to keep the one house.

Demolition permits were issued in August 1983, and a building permit for the apartment house was issued in December 1983. During 1984 the apartment house was constructed and the City issued a certificate of occupancy in January 1985. During this time, Parkridge did not seek any court action.

During construction, Parkridge asked the City for permission to modify the fourth floor of the apartment house to reduce the number of apartments on that floor from eight to five and the total number of units from 50 to 47. The City refused to grant the request on the ground that the alterations were not vested under RM 800 zoning and must comply with the requirements of L3 zoning, which had been adopted by the City subsequent to Parkridge's application for a permit. Parkridge requested a review by the director of the Department of Construction and Land Use, but did not further appeal.

Parkridge filed this action in December 1976, while the appeal in *Parkridge v. Seattle, supra,* was pending. However, Parkridge chose to stay trial of this action until after the building permit had been obtained and the apartment house had actually been constructed.

After a trial, the court found, *inter alia*:

19. At all times after December 5, 1973, the City, through its officials, officers, agents and servants, was aware of the plaintiffs' plans to build and operate an

apartment house on the site for profit. The City, through said officials, officers, agents and servants, intentionally prevented, blocked and delayed the plaintiffs' plans. The City did so because Mayor Wes Uhlman and his appointee, the Superintendent of Buildings, and John Miller, the Chairman of the Planning Committee of the City Council, and a prospective mayoral candidate, thought it politically expedient for them to cater to those opposing an apartment house on the property. As a result of the City's efforts to prevent plaintiffs from developing and operating an apartment house in accordance with the then existing Codes, the plaintiffs sustained losses and damages as herein detailed. The elements of intentional interference with prospective advantage were established by the evidence.

The court found Parkridge had been damaged in the total amount of $969,468.09. This sum included lost profits, loss of favorable financing, increased construction costs due to inflation, the cost of the first EIS which was discarded by the City, and attorney fees and costs incurred in *Parkridge v. Seattle, supra.*

The City appeals, raising 23 assignments of error. The Washington Environmental Council filed an amici brief in support of the City. The dispositive issues are whether tortious interference with prospective economic advantage was established by the evidence, and whether such interference was the proximate cause of Parkridge's damages. We answer both questions in the negative.

■ In *King v. Seattle, supra,* the Supreme Court recognized that the tort of interference with prospective economic advantage may apply to the actions of a city in denying a building permit. The court recited the elements of the tort as set forth in *Scymanski v. Dufault,* 80 Wn.2d 77, 491 P.2d 1050 (1971): (1) a relationship with others contemplating a contract, with at least a reasonable expectancy of fruition; (2) the interferor knew of the relationship or it was reasonably apparent; and (3) the interference causing the termination of the prospective relationship was intentional.

The third element, intent, encompasses the concept that

the interference was *unjustified. Scymanski v. Dufault,
supra* at 87; *Calbom v. Knudtzon,* 65 Wn.2d 157, 396 P.2d
148 (1964). The Restatement (Second) of Torts (1979) was
published after *King, Scymanski,* and *Calbom.* The Re-
statement substitutes the term "improper" for "unjusti-
fied." Restatement (Second) of Torts ch. 37, Introductory
Note, at 6.

Restatement (Second) of Torts § 766B provides:

> One who intentionally and *improperly* interferes with
> another's prospective contractual relation (except a con-
> tract to marry) is subject to liability to the other for the
> pecuniary harm resulting from loss of the benefits of the
> relation, whether the interference consists of
> (a) inducing or otherwise causing a third person not to
> enter into or continue the prospective relation or
> (b) preventing the other from acquiring or continuing
> the prospective relation.

(Italics ours.) Section 766B was adopted in *Caruso v. Local
690, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen &
Helpers,* 33 Wn. App. 201, 653 P.2d 638 (1982), *rev'd on
other grounds,* 100 Wn.2d 343, 670 P.2d 240 (1983).

Section 767 of the Restatement states the factors to be
applied in determining whether the interference is im-
proper:

> In determining whether an actor's conduct in inten-
> tionally interfering with a contract or a prospective con-
> tractual relation of another is improper or not, con-
> sideration is given to the following factors:
> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's
> conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of
> action of the actor and the contractual interests of the
> other,
> (f) the proximity or remoteness of the actor's conduct
> to the interference and
> (g) the relations between the parties.

Section 767 has been cited with approval in *Quadra Enters.*

*v. R.A. Hanson Co.,* 35 Wn. App. 523, 667 P.2d 1120 (1983), and in *Stidham v. Department of Licensing,* 30 Wn. App. 611, 637 P.2d 970 (1981).

Comment *a* to § 767 states that the weight to be accorded to each factor may vary according to whether the tort is intentional interference with an existing contract (§§ 766, 766A) or intentional interference with prospective economic advantage (§ 766B). Comment *b* to § 767 states at page 28:

> The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation. This Section states the important factors to be weighed against each other and balanced in arriving at a judgment; but it does not exhaust the list of possible factors.

Applying the factors of § 767 to this case, we find no substantial evidence that the City's interference was improper.

### NATURE OF THE ACTOR'S CONDUCT

In *Parkridge v. Seattle, supra,* the trial court found the City's decision to rezone was arbitrary and capricious because it was unsupported by credible evidence. The court also found the City had frustrated Parkridge's efforts to obtain a building permit. In the case at bench, the trial court found the City had made "unreasonable demands" on Parkridge throughout the permit application process.

In *Dunstan v. Seattle,* 24 Wn. App. 265, 268, 600 P.2d 674 (1979), this court expressed "skepticism" at the proposition that a city official's arbitrary and capricious decision, made in good faith, could be a ground for tort liability. We hold Parkridge is not automatically entitled to damages merely because the City was found to have acted arbitrarily and capriciously. The nature of the City's conduct was not improper within the meaning of the tort of

interference with prospective contractual relations.

## ACTOR'S MOTIVE

The City's motive was to curry favor with the voters who lived on Capitol Hill. There is no evidence the City's motive was to deprive Parkridge of a business opportunity or to drive up its construction costs. Comment *d* to § 767 states at pages 32–33:

> Intent alone, however, may not be sufficient to make the interference improper, especially when it is supplied by the actor's knowledge that the interference was a necessary consequence of his conduct rather than by his desire to bring it about. . . .
>
> . . . [I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper.

In *Titus v. Tacoma Smeltermen's, Local 25,* 62 Wn.2d 461, 383 P.2d 504 (1963), plaintiffs were nonunion employees of an industrial plant. They sued a labor union and several union officials, alleging defendants caused the plant to shut down, thus unlawfully interfering with plaintiffs' employment contracts. The trial court entered judgment in favor of the plaintiffs and the Supreme Court reversed. The Supreme Court held there could be no liability for tortious interference because there was no evidence defendants acted with the purpose of interfering with plaintiffs' employment. The court emphasized that all the evidence indicated defendants' purpose was to obtain favorable settlement of its grievances with the plant, and that the interference with plaintiffs' employment was merely indirect or incidental.

Similarly, in *Parkway Bank & Trust Co. v. Darien,* 43 Ill. App. 3d 400, 357 N.E.2d 211 (1976), the Illinois Appellate Court affirmed the dismissal of an action, in part because plaintiffs failed to allege any facts suggesting the defendant City purposely interfered with plaintiffs' real estate busi-

ness when it rezoned their property.

Implicit in finding 19, that City officials interfered because it was "politically expedient," is the conclusion that there was no specific purpose to damage Parkridge, but rather that any such damage was at most only an incidental result of the City's politically motivated actions. As explained by the trial judge in his oral opinion:

> Now, I am unable to find any deep, dark conspiracy, but I am able to find that the then Mayor of the City of Seattle counted up the number of votes and the amount of influence that were offered by the Capitol Hill Community Council and this other organization called Capitol Hill Land Use Review Board, and concluded that he had better fulfill whatever desires they had not to have this building built, and accordingly he instructed his department head to achieve that result. There could be no other explanation of many of the things that happened here.

The factor of motive therefore carries little weight toward producing a determination that the City's interference was improper.

### INTERESTS OF PARKRIDGE

Comment *e* to § 767 states that prospective contractual interests receive less protection than do existing contracts:

> Thus, depending upon the relative significance of the other factors, the actor's conduct in interfering with the other's prospective contractual relations with a third party may be held to be not improper, although his interference would be improper if it involved persuading the third party to commit a breach of an existing contract with the other.

This rule is particularly applicable here, since the alleged interference is not with an existing contract or even with a contemplated contract with existing parties, but only an interference with the right of Parkridge to contract with such prospective tenants as might be in existence at some time in the future.

## ACTOR'S INTEREST

Comment *f* to § 767 states that both the interferor's interest and the plaintiff's interests are to be measured in light of the respective social interests that would be advanced by their protection. Comment *f* also distinguishes interference done for economic gain from interference done in the public interest.

Courts have generally been reluctant to find liability by a noncompeting governmental entity. Annot., *Liability for Interference With At Will Business Relationship,* 5 A.L.R. 4th 9, 18 (1981). However, the Washington Supreme Court held a developer had a cause of action for tortious interference against the City in *King v. Seattle, supra.*

This case is distinguishable from *King,* wherein the City was found to have "'intended to harass and discriminate against Plaintiffs and to prevent Plaintiffs from constructing a commercial building on their property'". *King v. Seattle, supra* at 247. Here, on the other hand, there is no substantial evidence that the City intended to harass Parkridge. Nor is there any evidence the City intended to block all commercial development of Parkridge's property.

## SOCIAL INTERESTS

Again, protecting the freedom of action by the City must be balanced against Parkridge's business interests. We agree with the Oregon Court of Appeals analysis of the land use regulation process:

> [W]e see nothing improper with a decision on a conditional use being based in part on the feelings of the neighbors who will have to live with that use, if approved. . . . [T]he reality [is] that land–use administration at the local level is fundamentally a political process. . . . In our system and tradition, political process means democratic process. . . . [I]t is permissible and proper for local governments to give such public sentiment such consideration as may be relevant under the circumstances . . .

*Anderson v. Peden,* 30 Or. App. 1063, 1072–73, 569 P.2d 633, 640 (1977), *aff'd,* 284 Or. 313, 587 P.2d 59 (1978).

### PROXIMITY OR REMOTENESS OF THE ACTOR'S CONDUCT TO THE INTERFERENCE

This factor pertains exclusively to interference with *existing* contracts, as opposed to prospective economic relations. *See* Restatement § 767, comment *h.*

### RELATIONS BETWEEN THE PARTIES

Comment *i* to § 767 indicates interference will more likely be found to be improper if there is an existing contract. Again, this action concerns prospective contractual relations.

Taking all of these factors together, we hold that the tort of interference with prospective economic advantage was not established by substantial evidence. The City's actions were not improper within the meaning of the Restatement §§ 766B and 767. The judgment must therefore be reversed.

█ Additionally, we hold the City's actions were not a proximate cause of Parkridge's damages. In *King v. Seattle, supra,* the court held that, while a cause of action for tortious interference had been established, there was no proximate cause as a matter of law. The court stated proximate cause, or legal cause as opposed to cause in fact, is determined through mixed considerations of logic, common sense, justice, policy and precedent. *King v. Seattle, supra* at 250. The court declined to impose legal liability because plaintiffs had failed to exhaust their administrative remedies in connection with issuance of a federal permit, and because plaintiffs had not made any effort to avoid their damages but instead simply forfeited the property to their contract vendor. The court emphasized liability should not be imposed on the basis of the voluntary business decisions of the plaintiff.

Municipal liability for tortious interference with prospective economic advantage should not be premised on the independent unsubstantiated decision of a plaintiff that it would be unavailing to seek a possible administrative remedy accorded him under the law. If this were not so, the plaintiff would be able to create liability in another by his own independent judgment. We therefore

find no legal liability (proximate cause) in the City for the plaintiffs' damages here.

. . .

We do not believe it would be wise judicial policy to allow one party to create legal liability in another by a voluntary exercise of the complaining party's own personal business judgment not to seek to protect his rights in the legal forums provided him. This is especially so where, if the complaining party had exercised his legal rights in the first place, there may well have been no damage to his interests at all.

*King v. Seattle, supra* at 251–52.

This court followed the proximate cause analysis of *King v. Seattle, supra,* in *Hillis Homes, Inc. v. Snohomish Cy.,* 32 Wn. App. 279, 647 P.2d 43, *review denied,* 98 Wn.2d 1011 (1982). There, King County had failed to act within 90 days on an application for a preliminary plat, as required by former RCW 58.17.140. The court held the developer was entitled to a writ of mandamus compelling the County to exercise its discretion regarding the preliminary plat application. However, the court also held the developer was not entitled to consequential damages. After reviewing *King v. Seattle, supra,* the court concluded that, as a matter of law:

As with the property owner seeking permits in *King v. Seattle, supra,* the developer here went well beyond the 90-day time limit and delayed instituting mandamus proceedings until some 4½ months after the expiration of the statutory 90-day period. The County's liability cannot be premised on the developer's independent business judgment that it would be more advantageous to informally work with the County rather than promptly pursuing its legal remedies once the 90 days had expired.

*Hillis Homes, Inc. v. Snohomish Cy., supra* at 285.

The Supreme Court held a city's actions regarding certain rezones could not be the proximate cause of plaintiffs' harm, in *Alger v. Mukilteo,* 107 Wn.2d 541, 730 P.2d 1333 (1987). The plaintiffs there had failed to appeal the superior court's orders declaring two rezones to be invalid, which rezones would have permitted them to build condo-

miniums on their property.

Here, if in fact the City's actions were improper, Parkridge could have sought relief in the superior court. The three appealable steps under SEPA are (1) the threshold determination of significance or nonsignificance; (2) the determination of adequacy or inadequacy of the EIS; and (3) the final EIS. Appeal must be taken within 30 days of any of these steps or plaintiff's claims will be barred. *E.g., Spokane Cy. Fire Protec. Dist. 9 v. Spokane Cy. Boundary Review Bd.,* 97 Wn.2d 922, 652 P.2d 1356 (1982) (failure to appeal threshold determination); *Miller v. Port Angeles,* 38 Wn. App. 904, 691 P.2d 229 (1984), *review denied,* 103 Wn.2d 1024 (1985); *Northwest Land & Inv., Inc. v. Bellingham,* 31 Wn. App. 742, 644 P.2d 740 (1982) (arbitrary and capricious action held not to be proximate cause of plaintiff's damages because not appealed); *Dunstan v. Seattle, supra* (action for tortious interference by City for issuing modified building permit, based upon arbitrary and capricious application of SEPA, held barred by SEPA statute of limitation, RCW 43.21C.080).

Although the usual procedures were not followed, the Building Department's letters of December 1973 and April 1974 demanding an EIS are tantamount to declarations of significance. Therefore they should have been appealed within 30 days if Parkridge wished to bypass the EIS process.

In 1978, the City informed Parkridge its first EIS was not adequate and would have to be redone. Again, Parkridge was obligated to appeal the City's determination within 30 days if it wished to litigate the matter. Instead, it chose to sit on its hands until it had amassed almost $1 million in lost profits and other damages.

This case is distinguishable from *Valley View Indus. Park v. Redmond,* 107 Wn.2d 621, 733 P.2d 182 (1987). There, plaintiff had been in continuous communication and negotiations with the City, and the City had twice assured plaintiff it still had vested rights in its proposed development, even after the City had advised plaintiff by letter

that its building permit application had lapsed. The court held the letter was not a final, appealable order, and therefore the doctrine of exhaustion of administrative remedies did not apply.

Here, on the other hand, the City maintained a consistent position throughout its dealings with Parkridge. Parkridge repeatedly sought demolition permits without benefit of an EIS; the City repeatedly refused. The City's letters of December 1973, April 1974, and 1978 are clearly understandable as final determinations of Parkridge's rights. Thus, they are final, appealable orders. *Valley View,* at 634.

Parkridge vigorously argues this court is bound by the findings in the 1975 trial that the City's actions in canceling the permit application and down zoning the property were arbitrary and capricious. This is true. *King v. Seattle, supra.* However, it is also true that Parkridge's failure to appeal the City's requirement of an EIS proximately caused its own damages.

In summary, there is no substantial evidence that the City *improperly* interfered with the construction project.[3] In addition, Parkridge failed to establish the City's actions were a proximate cause of Parkridge's damages.

Parkridge cross–appeals the denial of its request for damages it contends resulted from the City's refusal to permit modification of the fourth floor of the apartment house while it was under construction. Parkridge fails to cite any authority for its contention, and we therefore will not consider it. *Yeats v. Estate of Yeats,* 90 Wn.2d 201, 580 P.2d 617 (1978); *Whatcom Cy. v. Kane,* 31 Wn. App. 250,

---

[3] RCW 64.40 was added by Laws of 1982, ch. 232. That act provides a cause of action for damages and attorney fees by a permit applicant against a government agency which has unlawfully delayed the processing of the permit application. The act does not apply here for several reasons. First, it is a clear break with the past and there is no indication the Legislature intended RCW 64.40 to be retroactive. *See* Senate Journal, 47th Legislature (1982), at 1449–50. Second, the act does not apply if the permit applicant agrees in writing to the conditions imposed upon the permit application. RCW 64.40.010(6). Third, the act does not apply unless the government agency knew or *reasonably should have known its acts were unlawful or exceeded lawful authority.* RCW 64.40.020(1).

640 P.2d 1075 (1981).

The damage award is reversed with directions to dismiss this action. The failure to award damages for the denial of the modification of the building permit is affirmed.

PEKELIS, J.; and CALLOW, J. Pro Tem., concur.

Reconsideration denied February 1, 1988.

Review granted by Supreme Court May 4, 1988.