[No. 54909–5.   En Banc.   June 22, 1989.]

RILEY W. PLEAS, ET AL, *Petitioners,* v. THE CITY OF SEATTLE, *Respondent.*

*Montgomery, Purdue, Blankinship & Austin,* by *John D. Blankinship* and *Jerry W. Spoonemore,* for petitioners.

*Douglas N. Jewett, City Attorney, Gordon F. Crandall, Senior Assistant,* and *Philip Mortenson, Assistant,* for respondent.

*Peter T. Jenkins* on behalf of Washington Environmental Council, amicus curiae for respondent.

UTTER, J.—Parkridge, a general partnership, seeks reversal of a Court of Appeals decision reversing a judgment against the City of Seattle in an action brought by Parkridge for intentional interference with a business expectancy. We reverse the Court of Appeals and remand to the King County Superior Court.

The facts of this case are the same as those involved in *Parkridge v. Seattle,* 89 Wn.2d 454, 573 P.2d 359 (1978),

with some additional facts found by the trial court. Clerk's Papers, at 144–66.

In 1966 and 1967 Parkridge purchased property near Volunteer Park on Capitol Hill in Seattle with the intent of constructing a high–rise 60–unit apartment complex. This use of the property was allowed under existing zoning regulations.

In the early 1970's, neighborhood residents formed the Capitol Hill Community Council and the Capitol Hill Land Use Review Board (CHLURB). Several members of this group wanted Parkridge to either renovate the existing structures on the property or construct town houses. CHLURB requested the City to give them special notice of any applications for demolition permits in the Capitol Hill area. Although this arrangement was not made with other groups in the city, then–Mayor Wes Uhlman directed the Superintendent of Buildings to accommodate CHLURB. The trial court found that this "special treatment . . . constituted a form of favoritism." Clerk's Papers, at 148–49.

In December 1973 Parkridge applied for a demolition permit for one of the nine houses on the property. In accordance with the special arrangement with CHLURB, the City promptly notified the Capitol Hill group of the Parkridge application. An employee of the Mayor's office, who was also a member of the Community Council executive board, met with the Superintendent of Buildings and reached an agreement that an Environmental Impact Statement (EIS) would be required before any demolition permits were issued for the Parkridge project. This agreement bypassed the normal procedures of the City under the State Environmental Policy Act of 1971 (SEPA). Standard procedures required consideration of an environmental checklist, personal visit to the site by City staff, and staff review, culminating in a declaration of either significance or nonsignificance. None of these steps were taken. The City also requested certain environmental data not customarily required of permit applicants.

During the same time period, some of the CHLURB officers met with John Miller, then chairman of the City Council Planning Committee and an unannounced candidate for Mayor. Miller encouraged the group to petition the City for a downzone of the Parkridge property to single family residential. CHLURB filed a petition for downzone of the property in early January 1974, approximately 1 month after Parkridge had applied for demolition permits.

While the downzone petition was pending, Parkridge applied for a permit to construct an apartment complex. In April 1974, the Superintendent of Buildings requested data for preparation of an impact statement for the proposed structure. This request also bypassed the normal procedures and again included items not customarily required of applicants for building permits for similar structures. Nonetheless, Parkridge employed an environmental consultant to assemble and submit the information requested.

In June 1974 the City Council, against the recommendation of the Planning Commission, granted the petition to downzone the Parkridge property to single family residential. Parkridge filed a petition for certiorari to review the City Council's decision.

After Parkridge submitted environmental data on the building permit, the building department notified Parkridge in January 1975 that it would take no further action on the permit. Parkridge then brought a mandamus action to compel continued processing of the building permit application. That action was consolidated with the action challenging the rezone.

In June 1975 the trial court ruled that the rezone was unreasonable, arbitrary and capricious and therefore void. The court also ruled that the City's refusal to process the permit application was improper. The court ordered the City to continue processing the building permit application promptly, diligently, and in good faith.

In December 1976 Parkridge filed the present action seeking damages from the City for intentional interference

with a business expectancy. The action was stayed, however, until after it had obtained a building permit and constructed the apartment complex.

This court rendered its decision in *Parkridge v. Seattle, supra,* in March 1978. We affirmed the finding of the trial court that the City's rezone action was arbitrary and capricious and therefore void. *Parkridge,* at 459. The court also held that Parkridge had a right to have its building permit application processed under the zoning ordinances in effect at the time it filed the application.

The City then notified Parkridge that the EIS prepared in 1974 was now outdated and would have to be redone in accordance with subsequent amendments to SEPA. Parkridge continued to press for a demolition permit for the nine dilapidated structures on its property, spurred by the City's repeated inspections and emergency orders which declared the structures to be an imminent hazard. Despite these emergency orders, the City continued to refuse to issue a demolition permit until a new EIS was completed for the entire project.

In October 1978 Parkridge moved for an order compelling the City to issue permits immediately for the demolition of the nine structures without requiring an impact statement. The King County Superior Court denied this motion on the basis of lack of jurisdiction since the relief sought was not predicated upon a right previously adjudicated; Parkridge did not appeal.

In May 1980 the City issued a draft EIS and a final EIS was issued in April 1981. In April 1982 the Department of Construction granted Parkridge a master use permit for a 50–unit apartment building. The CHLURB appealed from that decision but later settled their grievances with Parkridge.

The City issued demolition permits in August 1983 and a building permit in December 1983. Parkridge constructed the apartment house in 1984; the City issued a certificate of

occupancy in January 1985. The present action, begun in December 1976, proceeded to trial.

In rendering its decision, the trial court made several findings of fact which we adopt here since the findings are supported by substantial evidence. *Nichols Hills Bank v. McCool,* 104 Wn.2d 78, 82, 701 P.2d 1114 (1985). The trial court found that at all times after December 5, 1973 (the date Parkridge filed its original application for a demolition permit), the City, through its officers, intentionally prevented, blocked, and delayed construction of Parkridge's apartment complex merely because they "thought it politically expedient for them to cater to those opposing an apartment house on the property." Clerk's Papers, at 164. Furthermore, the City did not process Parkridge's application for permits "promptly and diligently and in good faith" as required by the judgment of the court entered in June 1975 and as required by this court in its opinion of March 1978.

The trial court also found that throughout the permit application process beginning in 1973,

> the plaintiffs were diligent, patient and forthright in their efforts to construct an apartment building on the property, notwithstanding unreasonable demands made upon them by City officials. They were ready, willing and able to construct the building as soon as permits were issued . . .

Clerk's Papers, at 163–64.

As a result of the City's tortious interference, the court determined that Parkridge had been damaged in the total amount of $969,468, which included lost profits, loss of favorable financing, increased construction costs due to inflation, the costs of the first EIS which was discarded by the City, and attorney fees. However, the court denied the claim for $155,240 in damages sought by Parkridge due to a subsequent change in the method of calculating property size which prevented it from modifying the fourth floor of the apartment structure.

The City appealed and the Court of Appeals reversed, holding that Parkridge had not presented sufficient evidence to prove that the City's interference with its business expectancy was improper. The court further held that the City's actions were not the proximate cause of Parkridge's damages. *Pleas v. Seattle*, 49 Wn. App. 825, 746 P.2d 823 (1987). This court granted Parkridge's petition for review.

I

We first consider § 766B of the Restatement (Second) of Torts and its effect in allocating burdens of proof and persuasion in actions for tortious interference.

The tort of intentional interference with contractual relations or business expectancy was defined by this court in *Calbom v. Knudtzon*, 65 Wn.2d 157, 396 P.2d 148 (1964). Relying in part on the first Restatement of Torts § 766 (1939), we identified four necessary elements for a prima facie case:

(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. Ill will, spite, defamation, fraud, force, or coercion, on the part of the interferor, are not essential ingredients, although such may be shown for such bearing as they may have upon the defense of privilege.

*Calbom*, at 162–63.

Once these elements are established, the defendant has the burden of justifying the interference or showing that his actions were privileged.

The burden of showing privilege for interference with the expectancy involved rests upon the interferor. Prosser on Torts (3d ed.) § 123, p. 967; 30 Am. Jur., Interference § 57, p. 93. The basic issue raised by the assertion of the defense is whether, under the circumstances of the particular case, the interferor's conduct is justifiable . . .

*Calbom,* at 163. Thus, the court in *Calbom* found that, although the evidence presented in that case was susceptible to different interpretations as to whether the defendant's interference was justified, the "defendants have not sustained their burden of proof." *Calbom,* at 166.

This approach was followed in *Scymanski v. Dufault,* 80 Wn.2d 77, 491 P.2d 1050 (1971) where this court rejected the defendant's argument that its conduct was privileged. This court has continued to follow *Calbom* in cases involving tortious interference. *See Sea–Pac Co. v. United Food & Comm'l Workers, Local 44,* 103 Wn.2d 800, 805, 699 P.2d 217 (1985). The theory underlying this tort was aptly summarized by the appellate court of Illinois:

> the law draws a line beyond which no member of the community may go in intentionally intermeddling with the business affairs of others; that if acts of which complaint is made do not rest on some legitimate interest, or if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated, the ensuing loss should be redressed . . .

*Rock Falls v. Chicago Title & Trust Co.,* 13 Ill. App. 3d 359, 362, 300 N.E.2d 331, 333 (1973).

■ In *King v. Seattle,* 84 Wn.2d 239, 525 P.2d 228 (1974), this court recognized that the tort of interference with prospective economic expectancy as articulated in *Calbom* may apply to the actions of a municipality denying a building permit. In that case, the court found that the City's intentional and wrongful refusal to issue street and building permits constituted intentional interference with Kings' business expectancy in developing their property. *King,* at 247–51. *King* is not alone in applying the tort of intentional interference against a municipality. *See Rock Falls* (finding a cause of action for tortious interference with business expectancy against municipality when it wrongfully withheld various permits requested by developer); *see also* Annot., *Liability for Interference With At Will Business Relationship,* 5 A.L.R.4th 9, 65 (1981).

Under *Calbom,* liability is based simply on the intentional interference with a known business expectancy. Any justification or privilege the defendant might have is treated as an affirmative defense which a defendant must prove. This is the general approach of the first Restatement and of most courts. *See* Annot., *Liability of Third Party for Interference With Prospective Contractual Relationship Between Two Other Parties,* 6 A.L.R.4th 195 (1981); 45 Am. Jur. 2d *Interference* § 56 (1969) ("The burden is on the defendant to sustain by proof his allegations of justification or privilege.").

The authors of the second Restatement of Torts modified this approach in favor of one that defines the tort as involving "improper" as well as intentional interference. Restatement (Second) of Torts, §§ 766, 766B (1979). Factors to be weighed in determining the impropriety of the defendant's interference are discussed in § 767, and are similar to the factors used to determine a defendant's privilege or justification under the first Restatement.

This change was made in response to a concern articulated by many courts and commentators that the prima facie tort approach in which every intentional infliction of harm is prima facie tortious unless justified. This approach required too little of the plaintiff insofar as it left the major issue in the controversy—the wrongfulness of the defendant's conduct—to be resolved by asserting an affirmative defense. *See Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293, 303 (Utah 1982).

Although its authors declined to take a clear position on the matter, the revised language of the second Restatement can be interpreted to require the plaintiff to show in the first instance that the defendant's interference was improper. *See* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 129, at 983–84 (5th ed. 1984). The Court of Appeals adopted this approach and ruled that the second Restatement modifies Washington law and effectively shifts to the plaintiff the burden of proving that the intentional interference complained of was

the result of improper means or motive. Noting that the second Restatement was published after this court's decisions in *Calbom, Scymanski,* and *King,* the Court of Appeals expressly adopted the second Restatement and held that Parkridge had not met its burden of proving that the City acted improperly. *Pleas v. Seattle, supra* at 833–34.

While we agree with the general thrust of § 766B, we disagree with the interpretation given this provision of the second Restatement by the Court of Appeals, particularly regarding the burden of persuasion problem. Far from announcing a new rule as the Court of Appeals suggests, the authors of the second Restatement acknowledge that

> there is little consensus on who has the burden of raising the issue of whether the interference was improper or not and subsequently of proving that issue . . . Instead of laying down a categoric rule for one position or the other, therefore, it seems appropriate to draw a more particularized line depending upon whether the precise matter goes more specially to the culpability of the actor's conduct in general or to its justification under the specific facts.

Restatement (Second) of Torts § 767, comment *k,* at 38. The revised language of the second Restatement was intended more to clarify the analysis than to change the law. Restatement (Second) of Torts, ch. 37 Introductory Note, at 7.

We believe that the right balance has been struck by our colleagues on the Oregon Supreme Court. Rejecting the prima facie tort approach of the first Restatement and declining to adopt in toto the implication of the second Restatement that a plaintiff prove that the interference was "improper" under the factors listed in § 767, that court, in an opinion by Justice Linde, redefined the tort as "wrongful interference with the economic relationships". *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.,* 283 Or. 201, 204, 582 P.2d 1365, 1368 (1978). Thus, a cause of action for tortious interference arises from either the defendant's pursuit of an improper objective of harming the plaintiff or the use of

wrongful means that in fact cause injury to plaintiff's contractual or business relationships. *Top Serv.,* 582 P.2d at 1368. A claim for tortious interference is established

> when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. . . . No question of privilege arises unless the interference would be wrongful but for the privilege . . . Even a recognized privilege [however] may be overcome when the means used by defendant are not justified by the reason for recognizing the privilege.

*Top Serv.,* at 209–10. Interference can be "wrongful" by reason of a statute or other regulation, or a recognized rule of common law, or an established standard of trade or profession. Therefore, plaintiff must show not only that the defendant intentionally interfered with his business relationship, but also that the defendant had a "duty of non–interference; *i.e.,* that he interfered for an improper purpose . . . or . . . used improper means . . ." *Straube v. Larson,* 287 Or. 357, 361, 600 P.2d 371 (1979).

We adopt the Oregon formulation of this tort and follow other courts in doing so. *See Leigh Furniture & Carpet Co. v. Isom, supra; Anderson v. Dairyland Ins. Co.,* 97 N.M. 155, 637 P.2d 837, 840–41 (1981). It is one that best comports with our previous opinions on this subject and best reflects the underlying spirit of the modifications made in the second Restatement. Implicit in our previous cases dealing with tortious interference has been some showing that the interference complained of be "wrongful" in some way or that plaintiff had a "duty of non–interference." Thus, in *King* we found that the City was under a "duty to act fairly and reasonably in its dealings with the plaintiffs" and that this duty was breached when the City wrongfully refused to grant a building permit. *King,* at 247–48. However, matters of privilege or justification continue to be affirmative defenses to be raised by the defendant.

In the present case, Parkridge alleges both improper motives and improper means of interference. The improper

motives arise from the city officials' apparent desire to gain the favor of a politically active and potentially influential group opposing the Parkridge project. The improper means arise from the City's actions in refusing to grant necessary permits and arbitrarily delaying this project. As we stated in *King,* the City's arbitrary and capricious actions can be considered evidence of tortious interference with a business expectancy. *King,* at 247–48.[1]

There is ample evidence to support the trial court's finding that the City's actions in this decade–long episode were sufficiently improper or wrongful so as to support a claim for tortious interference even under our new formulation of this tort. Parkridge was required to show that the City's conduct was not only intentional but wrongful, and it has done so; the burden then shifted to the City to show that its conduct was either privileged or justified. The City has failed to produce persuasive evidence that its conduct comes under either category.

Applying the analysis of *Dunstan v. Seattle,* 24 Wn. App. 265, 268, 600 P.2d 674 (1979), the Court of Appeals stated that "Parkridge is not automatically entitled to damages merely because the City was found to have acted arbitrarily and capriciously." *Pleas,* at 834. This statement is true but misses the essence of Parkridge's claim. Parkridge does not contend that it is "automatically entitled to damages" because of the City's abuse of power; it simply contends that the City's arbitrary and capricious conduct is evidence of tortious interference. In any event, *Dunstan* does not appear wholly applicable since the plaintiff in that case failed because he, unlike Parkridge in the present case, could show no duty and no intentional interference.

The Court of Appeals also stated that the City's motive carries little weight in this case because city officials acted

---

[1] We distinguish here actions of the City Council and those of other city officials. A rezone action is quasi judicial in nature and the City Council has judicial immunity from tort liability when making a rezone decision. *See Parkridge,* at 460. This immunity does not extend to actions by other city officials. *King,* at 247.

for the primary purpose of political gain, not for the purpose of interfering with Parkridge's prospective business opportunities. "The City's motive was to curry favor with the voters who lived on Capitol Hill." *Pleas,* at 835. Insofar as the city officials could gain political favor with this group only by directly interfering with Parkridge's business expectancies, this conclusion is curious. The second Restatement does not say that interference must be the actor's primary motive before liability will attach. To the contrary, the authors suggest that the plaintiff be required to show only that "the actor was motivated, in whole or in part, by a desire to interfere . . . The desire to interfere with the other's contractual relations need not, however, be the sole motive." Restatement (Second) of Torts § 767, comment *d,* at 32.

The second Restatement further states that impropriety may be more easily found if the means of interference was wrongful, even if the actor had no specific purpose to interfere. The efforts made by employees in the Mayor's office and building department to block Parkridge's legitimate construction project were an improper means of interference. *Parkridge,* at 466. There is ample evidence in the record to support the finding of the trial court that the City singled out Parkridge's project and applied its land use regulations in such a manner to block any apartment development on the property. Clerk's Papers, at 155.

There is no rational basis for the argument that allowing a cause of action for tortious interference against a municipality for actions involved here would have a "chilling effect" on public officials who must exercise discretion in reviewing permits for controversial projects. The only "chilling effect" we envision is against public officials exercising their official powers in a blatantly biased manner to gain favor with a certain community group.

Nor do we accept the suggestion of the Court of Appeals that the City's actions in this instance were simply part of the "political process." *Pleas,* at 837. Municipal liability for the flagrant abuse of power by officials who intentionally

interfere with the development rights of property owners cannot be avoided simply by labeling such actions "political." *See Alger v. Mukilteo,* 107 Wn.2d 541, 730 P.2d 1333 (1987); *Rock Falls v. Chicago Title & Trust Co.,* 13 Ill. App. 3d 359, 300 N.E.2d 331 (1973).

## II

■ Having found that Parkridge presented sufficient evidence to support its claim for tortious interference, we must next determine whether the City's actions were the proximate cause of Parkridge's damages. The issue of proximate cause is broader than cause in fact and involves "mixed considerations of logic, common sense, justice, policy, and precedent." *King,* at 250, quoting 1 T. Street, *Foundations of Legal Liability* 110 (1906). Essentially the question is whether the defendant should be held liable for the damages that are in fact caused by its actions.

In *King,* we declined to find the City liable for the damages caused by its tortious interference because we could not find proximate cause. In that case, the plaintiffs "made no effort to exhaust their federal administrative remedies nor did they attempt to avoid their damages"; therefore, the plaintiffs' decision not to pursue their project "was a voluntary business judgment" which could not form the basis of municipal liability. *King,* at 250–51.

> Municipal liability for tortious interference with prospective economic advantage should not be premised on the independent unsubstantiated decision of a plaintiff that it would be unavailing to seek a possible administrative remedy accorded him under the law.

*King,* at 251. We have reached similar results in other cases in which the plaintiff might have avoided some or all of his damages by pursuing available legal remedies. *See Alger v. Mukilteo, supra; see also Hillis Homes, Inc. v. Snohomish Cy.,* 32 Wn. App. 279, 285, 647 P.2d 43, *review denied,* 98 Wn.2d 1011 (1982).

The Court of Appeals came to the same conclusion about Parkridge in the present case:

[I]f in fact the City's actions were improper, Parkridge could have sought relief in the superior court. . . .

. . .
. . . Instead, it chose to sit on its hands until it had amassed almost $1 million in lost profits and other damages.

. . .
. . . Parkridge's failure to appeal the City's requirement of an EIS proximately caused its own damages.

*Pleas,* at 840–41.

This conclusion is unwarranted. The trial court entered a finding, for which there is substantial evidence, that Parkridge diligently pursued its legal remedies when the City refused to process its applications for demolition and building permits in 1974 and 1975. *Parkridge,* at 466. The conclusion of the Court of Appeals rests entirely upon the fact that Parkridge did not appeal the City's demand made in 1974 that it file an EIS.

Although Parkridge complied with the additional requirements that city officials placed upon its application, the compliance cannot be said to have been "voluntary" in the sense that term was applied in *King.* The trial court finding of "diligence" relieves the developer from the obligation to continue futile efforts. To insist that a developer must appeal each additional requirement the City imposes in an effort to prevent legitimate development as soon as these are imposed would sorely try the fortunes, let alone patience, of the wealthiest developer. In light of the trial court's finding of diligence, the decision to comply with the City's additional permit requirements as a tactical decision does not preclude Parkridge from pursuing a claim for damages arising from the City's intentional interference.

The Court of Appeals suggests that Parkridge did nothing to further its application for a permit after the City required an EIS, and that the reason the building department canceled the application in January 1975 was because "6 months had elapsed without any action". *Pleas,* at 829. This conclusion is also at odds with the record, which shows that Parkridge "pursued diligently" the performance of

architectural services and assembly of data for the environmental assessment. Clerk's Papers, at 158. Parkridge was in contact with building department officials throughout this period. On December 31, 1974, Parkridge delivered all necessary data for the draft environmental impact statement. It was a month later that the City notified Parkridge that it would not process the permit application. Clerk's Papers, at 153.

Parkridge immediately challenged this decision in King County Superior Court which ruled in its favor in June 1975. We affirmed the decision in March 1978. During this period, Parkridge was pursuing its legal remedies to reverse the arbitrary and capricious downzoning of its properties and to compel the City to issue the necessary permits. We fail to see how Parkridge could have done more. Likewise in the period after March 1978, when the City was under a court imposed obligation to process the Parkridge application "promptly, diligently and in good faith," Parkridge initiated legal proceedings to compel the City to issue the necessary permits when it refused to do so. Parkridge pursued all available remedies to facilitate construction of an apartment on Capitol Hill.

Second, an additional element with respect to proximate cause exists under the facts of this case. Specifically, the trial court did not delineate between those damages caused by the rezone action of the City Council that are immune from tort liability, see footnote 1, and those damages caused by other City action for which the City must answer. As not all damages requested by Parkridge can be said as a matter of law to have been proximately caused by non-immune City actions, and as further factual development is necessary to determine which were and which were not so caused, this issue requires further consideration upon remand.

### III

Because the trial court did not distinguish between the rezone decision itself, for which the City Council has quasi-

judicial immunity, and the actions of other city officials which are not protected from liability, we must remand this case for further factual development. Specifically, we instruct the trial court to limit its calculation of damages to those which arise from nonprotected actions by city officials in tortiously interfering with this project.

We reverse the decision by the Court of Appeals and remand to the King County Superior Court.

BRACHTENBACH, DOLLIVER, PEARSON, ANDERSEN, and DURHAM, JJ., and CUNNINGHAM and HAMILTON, JJ. Pro Tem., concur.

DORE, J. (dissenting)—I dissent.

In view of the majority's concession that no proximate cause exists[2] and the fact that the City's actions supporting the trial court's judgment are not actionable, this case should be dismissed. Plaintiff's judgment is essentially based on two points, neither of which is actionable as a matter of law: (1) the downzoning of Parkridge's property by the City Council; and (2) the requirements of an Environmental Impact Statement (EIS). The majority for some unexplainable reason remands this case for further factual development to determine whether the actions of the city officials, who are not protected by immunity, proximately caused Parkridge's damage. In other words, the majority says remand to the trial judge so he can dismiss it. I would dismiss the case *now*. The actions of the City, its officials and its employees were not wrongful. Furthermore, as the majority concedes, proximate cause does not exist between the City's actions and Parkridge's damages.

This case boils down to two actions by the City and its officials: (1) the downzoning; and (2) the EIS requirements.

---

[2]The majority states: "As not all damages requested by Parkridge can be said as a matter of law to have been proximately caused by nonimmune City actions, and as further factual development is necessary to determine which were and which were not so caused, this issue requires further consideration upon remand." Majority, at 809.

As far as the downzoning is concerned the majority concedes that these actions of the City Council are immune from tort liability. Therefore, the downzoning cannot support the plaintiff's judgment. The next issue is whether the City's requirements of an EIS are actionable and can be used as evidence to support plaintiff's judgment.

Regardless of whether the zoning was correct for Parkridge's proposed apartment complex, the City Council may request an EIS and an unfavorable EIS may, in and of itself, defeat the developer's permit. In *West Main Assocs. v. Bellevue,* 49 Wn. App. 513, 742 P.2d 1266 (1987), *review denied,* 112 Wn.2d 1009 (1989), the city council exercised its authority under SEPA and rejected the project, even though it complied with the zoning ordinances, on the basis of significant adverse environmental impact which could not reasonably be mitigated. In *West Main Assocs.,* the Court of Appeals held that the City's disapproval of the building design was justified solely on environmental grounds. The court stated at page 525:

Thus, the SEPA standards or policies are not "elevated" above specific zoning ordinances, but rather they provide general guidance for determining whether the environmental impacts of an otherwise acceptable project require the denial of, or the imposition of conditions on, the project. In this regard, our courts have repeatedly stated that SEPA is not a substitute for local zoning ordinances, but "overlays local ordinances and must be enforced even where a particular use is allowed by local law or policy." *Cook v. Clallam Cy.,* 27 Wn. App. 410, 415, 618 P.2d 1030 (1980), *review denied,* 96 Wn.2d 1008 (1981); *West Main Assocs. v. Bellevue,* 106 Wn.2d 47, 53, 720 P.2d 782 (1986); *Polygon [Corp. v. Seattle,* 90 Wn.2d 59, 65, 578 P.2d 1309 (1978)]; RCW 43.21C.060.

Furthermore, the court rejected at page 526 appellant's contention that the council's action was a denial of its "vested rights."

Though a vested right fixes the ordinances with which a building permit and subsequent development must comply, SEPA gives a municipality discretion to deny an application because of adverse environmental impacts

even if the project meets all other local requirements. *West Main Assocs.*, 106 Wn.2d at 53.

In the present case, the building of a 50–unit apartment building in a residential neighborhood is a major action, significantly affecting the quality of the environment. Under these facts, SEPA mandates the preparation and circulation of an EIS. *Polygon Corp. v. Seattle,* 90 Wn.2d 59, 65, 578 P.2d 1309 (1978); RCW 43.21C.030(1), (2)(c). The effect of the majority opinion will be to expose the City to tort liability anytime it requests an EIS. This in turn would dissuade the City from requiring an EIS before it issues a permit. A permit issued for a major action without an EIS would be completely contrary to the laws, goals and purpose under SEPA.

Furthermore, the majority fails to recognize that SEPA decisions are discretionary, *West Main Assocs.,* 49 Wn. App. at 525, and are therefore immune.

The City's decision to require an EIS can be characterized as a discretionary governmental act; therefore, it cannot form the basis for tort liability. *Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 252, 407 P.2d 440 (1965); *King v. Seattle,* 84 Wn.2d 239, 245, 525 P.2d 228 (1974). The test to determine whether a city's act was discretionary and thereby immune is to consider the following questions:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Evangelical United Brethren Church v. State, supra* at 255. If these questions can be answered in the affirmative, then the challenged act can be classified as nontortious. Under the analysis of *Evangelical United Brethren Church v. State, supra,* the City's requirement of an EIS is a discretionary act which cannot form the basis for tort liability.

The City's requirement of an EIS involves the State's environmental policy to protect efforts which will prevent or eliminate damage to the environment. RCW 43.21C.010. The requirement of an EIS, to the extent that the building permit is for an action significantly affecting the environment is necessary for the realization of the State's policy. The City's decision requires an evaluation of various environmental factors and their impact on the quality of the environment. Finally, the City through SEPA has the requisite constitutional and statutory authority to mandate the requirement of an EIS. *Polygon,* at 65–67. *Polygon* determined that SEPA confers upon the City the authority to apply the standards expressed in SEPA to the building permit application of a particular property owner.

Furthermore, recent case law supports the above conclusion that decisions made pursuant to SEPA are discretionary. In *Polygon,* the court stated that "[t]o the extent that the issuance of a building permit is a 'major action significantly affecting the quality of the environment', that issuance is no longer a ministerial act." *Polygon,* at 65. In *Juanita Bay Vly. Comm'ty Ass'n v. Kirkland,* 9 Wn. App. 59, 73, 510 P.2d 1140, *review denied,* 83 Wn.2d 1002 (1973) the court found

> [t]he change in the substantive law brought about by SEPA introduces an element of discretion into the making of decisions that were formerly ministerial, such that even if we assume, arguendo, that the issuance of a grading permit was, prior to SEPA, a ministerial, nondiscretionary act, SEPA makes it legislative and discretionary.

*Juanita Bay,* at 73, *quoted in Polygon,* at 64. In *Seattle Shorelines Coalition v. Justen,* 93 Wn.2d 390, 394, 609 P.2d 1371 (1980), the court noted the permit "process is

almost entirely ministerial, except for the superintendent's exercise of discretion with regard to environmental considerations, pursuant to RCW 43.21C and our holding in *Polygon Corp. v. Seattle,* 90 Wn.2d 59, 578 P.2d 1309 (1978)."

In conclusion, the actions of the City in downzoning the Parkridge property and in requiring an EIS cannot be considered the basis for liability. Nonetheless, the majority holds that tortious interference exists because of the actions of the city officials. What exactly did Mayor Uhlman, Councilman Miller and the Superintendent of Buildings do? What flagrant abuse of power by city officials occurred?

### OTHER ACTIONS OF CITY OFFICIALS

Mayor Uhlman directed the Superintendent of Buildings to establish a system for notice to the Capitol Hill Community Council, Capitol Hill Land Use Review Board and Capitol Hill Chamber of Commerce of applications for any demolition permits in the Capitol Hill area of Seattle. While this may have been "favoritism", the Mayor, an elected official, was responding to a legitimate request from his constituents. Furthermore he was facilitating the cooperation of various city departments to assist the Department of Community Development in the neighborhood planning effort. Finally, this action was done prior to any action on the part of Parkridge to pursue a demolition permit. Clerk's Papers, at 147–48. Can the democratic action of the Mayor, before Parkridge has made known its business expectancy, be tortious interference? Obviously not.

The superintendent, besides requiring environmental assessment information before issuing any permits, canceled plaintiff's permit based on the downzone action taken by the City Council. This action was not improper. At the time this action was taken, the superintendent did not know the downzoning was arbitrary and capricious. Therefore, when he denied the plaintiff's permit, he did so because it did not comport with the present zoning laws.

The superintendent did not have the benefit of subsequent court decisions which held that the plaintiff had a vested right in the prior zoning.

Councilman Miller met with members of the Capitol Hill Community Council and Capitol Hill Land Use Review Board prior to 1974 to discuss land use matters affecting the Capitol Hill area. At this meeting he suggested that the group seek downzoning of certain areas. Clerk's Papers, at 147. Does a general suggestion of a public official to concerned community members constitute tortious interference?

Public officials are entitled to a presumption that they have regularly and faithfully performed their duties. 29 Am. Jur. 2d *Evidence* § 171 (1967). Furthermore, it should be permissible and proper for local governments to consider public sentiment in land use decisions, *Anderson v. Peden,* 30 Or. App. 1063, 1073, 569 P.2d 633, 640 (1977). "[L]and–use administration at the local level is fundamentally a political process. . . . In our system and tradition, political process means democratic process."

The Mayor, Councilman, and Superintendent of Buildings did not flagrantly abuse their power. These officials were carrying out their respective roles as conscientious public servants in governing their city. In sum, it is not a tort for government to govern in a democratic fashion.

Even if the actions of the City can be considered improper there is no proximate cause between the City's actions and Parkridge's damages as conceded by the majority and for the additional reasons set forth below.

## PROXIMATE CAUSE

This court has refused to find proximate cause for damages caused by a City's tortious interference in cases in which the plaintiff might have avoided some or all of his damages by pursuing available administrative remedies accorded him under the law. *King v. Seattle,* 84 Wn.2d 239, 251, 252, 525 P.2d 228 (1974); *see Alger v. Mukilteo,* 107 Wn.2d 541, 546, 730 P.2d 1333 (1987). This court has

emphasized liability should not be imposed on the basis of the voluntary business decisions of the plaintiff: "Municipal liability . . . should not be premised on the independent unsubstantiated decision of a plaintiff that it would be unavailing to seek a possible administrative remedy accorded him under the law." *King,* at 251.

The Court of Appeals in the present action found "Parkridge's failure to appeal the City's requirement of an EIS proximately caused its own damages." *Pleas v. Seattle,* 49 Wn. App. 825, 841, 746 P.2d 823 (1987), *review granted,* 110 Wn.2d 1021 (1988). The majority *incorrectly* states the conclusion of the Court of Appeals "rests entirely upon the fact that Parkridge did not appeal the City's demand made in 1974 that it file an EIS." Majority, at 808. The majority supports this incorrect statement upon an *incomplete* quotation from the Court of Appeals decision. See majority, at 808. The full quotation demonstrates that the Court of Appeals based its conclusion not upon a single failure, but upon a number of failures of Parkridge to pursue its administrative remedies:

> Here, if in fact the City's actions were improper, Parkridge could have sought relief in the superior court. . . .
> Although the usual procedures were not followed, the Building Department's letters of December *1973* and April *1974* demanding an EIS are tantamount to declarations of significance. Therefore they should have been appealed within 30 days if Parkridge wished to bypass the EIS process.
> In *1978,* the City informed Parkridge its first EIS was not adequate and would have to be redone. Again, Parkridge was obligated to appeal the City's determination within 30 days if it wished to litigate the matter. Instead, it chose to sit on its hands until it had amassed almost $1 million in lost profits and other damages.

(Italics mine.) *Pleas,* at 840.

Instead of seeking administrative remedies to the City's demands, it chose other avenues to avoid the EIS requirements. In February 1974, Parkridge dropped its efforts to

obtain a demolition permit and instead applied for a building permit to construct its apartments. Construction would necessarily have required demolition of the nine dilapidated buildings. Clerk's Papers, at 156. In September 1978, Parkridge again requested a demolition permit and this request was denied for the same reason as in 1973, the need for an adequate EIS response. In October 1978, plaintiff petitioned in King County cause 792863, the downzone case, for an order compelling the City to immediately issue, without the necessity for an EIS, permits for the demolition of the nine houses. The motion was denied because the court lacked jurisdiction. In other words, the City's requirement of an EIS was never adjudicated in the rezone case nor was it ever administratively appealed. Parkridge never sought a remedy accorded it under the law. Parkridge's damages flow primarily from its delay in fulfilling the City's requirement of an EIS. It was not until April 1981 that a final EIS was issued.

In sum, this is a case in which the plaintiff could have easily avoided its damages by pursuing its right to appeal the EIS requirement on at least three different occasions. Nonetheless, the majority contends that "Parkridge pursued all available remedies to facilitate construction of an apartment on Capitol Hill" and "[w]e fail to see how Parkridge could have done more." Majority, at 809. However, Parkridge could have appealed the City's denial of its permit. For some reason Parkridge did not want to have the EIS requirement reviewed, and tried different tactical moves to bypass this request. Parkridge's decision not to have the EIS requirement reviewed was a "voluntary business judgment" which cannot be the basis of municipal tort liability.

The majority further found the Court of Appeals conclusion unwarranted because the majority *erroneously* claims that the trial court in the downzone case entered a finding that "Parkridge diligently pursued its *legal* remedies . . ." (Italics mine.) Majority, at 808. The majority then went on to hold:

In light of the trial court's finding of diligence, the decision to comply with the City's additional permit requirements as a tactical decision does not preclude Parkridge from pursuing a claim for damages arising from the City's intentional interference.

Majority, at 808.

Contrary to the majority's contention, the trial court in the downzone case did not find that Parkridge "diligently pursued its legal remedies". The trial court said nothing about diligence in regards to legal remedies. The trial court merely found that Parkridge diligently pursued its performance of *architectural services* and its *assembly of data. Parkridge v. Seattle*, 89 Wn.2d 454, 465–66, 573 P.2d 359 (1978). Clerk's Papers, at 158. Since there was no trial court finding that Parkridge "diligently pursued its legal remedies", Parkridge cannot be excused from failing to appeal the City's EIS decision to deny issuance of a permit.

CONCLUSION

The majority opinion concludes at page 810: "Specifically, we instruct the trial court to limit its calculation of damages to those which arise from nonprotected actions by city officials in tortiously interfering with this project." *All* city officials involved interfered with the project by downzoning the land and by requesting various Environmental Impact Statements, but such actions are immune.

If actions of the Mayor, City Councilman and the Superintendent of Buildings are immune from liability for damages by reason of downzoning and requests for Environmental Impact Statements, any incidental actions that such officials used or participated in, on the strategy of downzoning and requesting Environmental Impact Statements, are also immune. Who are these public officials who are not immune that the majority speaks of.

In any event, the City's requirements of an EIS were not the proximate cause of Parkridge's damages. The plaintiff did not seek review in the courts, as he undoubtedly thought he would have lost, as his contentions were that the downzoning and the requests for Environmental Impact

Statements by the City had caused his delay and damages. Downzoning and requests for Environmental Impact Statements by the City, however, are immune.

I would affirm the Court of Appeals and dismiss the plaintiff's judgment.

Reconsideration denied October 4, 1989.