**MINNESOTA MINING AND MANUFACTURING CO., Plaintiff,**

**v.**

**Sergio FRANCAVILLA, Defendant.**

**No. 3:01CV2251(TPS).**

United States District Court, D. Connecticut.

Jan. 31, 2002.

Everett E. Newton, Hugh F. Murray, III, Murtha Cullina LLP, Hartford, CT, Barry J. Waters, Murtha Cullina LLP, New Haven, CT, for plaintiff.

Michael D. Neubert, Deborah M. Neubert, Kevin Michael Godbout, Simon I. Allentuch, Neubert, Pepe & Monteith, New Haven, CT, for defendant.

## MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [1]

SMITH, United States Magistrate Judge.

### I. *PRELIMINARY STATEMENT*

Before the court is the plaintiff's motion for a preliminary injunction **(Doc. # 4)**

---

1. In accordance with the provisions of 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties in this case consented to having a United States Magistrate Judge conduct any and all proceedings in this matter, including the trial,

pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. The plaintiff, Minnesota Mining & Manufacturing Co. ("3M"), brought this action against its former employee, defendant Sergio Francavilla, for allegedly breaching an employment agreement ("Agreement"). 3M now seeks a preliminary injunction to enjoin the defendant from working for one of its competitors, StockerYale. An evidentiary hearing and oral argument of the motion was held on January 4, 7, & 8, 2002. For the reasons set forth below, the pending motion is **GRANTED**.

## II. *DISCUSSION*

### A. FACTS

Based upon the credible testimony, the pleadings, the affidavits, the exhibits and other evidence, and the written and oral arguments of counsel, the court makes the following findings. 3M's Optical Component business unit has facilities and resources in St. Paul, Minnesota and West Haven, Connecticut. *See* Parties' Joint Stipulation of Facts (hereinafter "JF") at 1. In addition, the corporation has manufacturing and sales facilities throughout the United States and the world. The corporation researches, manufactures and markets hundreds of products and employs tens of thousands of employees. The St. Paul plant is primarily focused on the research and development of optical fiber with some manufacturing. 3M's West Haven unit is primarily focused on the manufacturing of optical fiber with some development. *Id.* In addition, the West Haven plant produces a variety of specialty opti-

cal fibers, to which there are only a handful of competitors in the world.

On December 13, 1999, 3M hired the defendant to work in its West Haven, Connecticut facility as a Senior Manufacturing Specialist.[2] *Id.* at 3. Prior to his employment, with 3M the defendant had worked in the optical fiber industry for approximately seventeen years at the following companies: Corning Glass Works, SpecTran Corporation, Corporation, n/k/a Lucent Technologies, and Karl Storz Endovision, Inc.

As a condition of his employment with 3M, the defendant was required to enter into and, in fact, did enter into the Agreement on December 13, 1999.[3] *See* JE-3. The Agreement, which all 3M technical and management employees were required to sign, contained the following non-competition provision:

"F. FOR a period of two years after termination of my employment with 3M:

. . . . .

c. If I have been or am employed by 3M in a non-sales capacity, I will not render, to any Conflicting Organization, services, directly or indirectly, in the United States or in any country in which 3M has a plant for manufacturing a product upon which I work during my employment by 3M or in which 3M provides a service in which I participate during my employment by 3M, except that I may accept employment with a large Conflicting Organization whose business is diversified (and which has separate and distinct

order the entry of a final judgment, and conduct all post-judgment proceedings.

2. 3M offered the defendant the position by an offer letter dated November 5, 1999. *See* Joint Exhibit (hereinafter "JE") 16.

3. The 3M offer letter contained a copy of the Agreement. The offer letter instructed the

defendant to please read the Agreement "carefully and make sure you understand it." *See* JE-16. In addition, the Agreement was attached with a cover sheet explaining the importance that 3M places on its intellectual property. *See* Def.'s Ex. 6.

divisions), and which as to part of its business is not a Conflicting Organization, provided 3M, prior to my accepting such employment, shall receive separate written assurances satisfactory to 3M from such Conflicting Organization and from me, that I will not render services directly or indirectly in connection with any Conflicting Product."

*Id.*[4] In addition, the Agreement also contained the following confidentiality provision:

"B. EXCEPT as required in my duties to 3M, I will never, either during my employment by 3M or thereafter, use or disclose any Confidential Information as defined in paragraph 2 hereinabove and, during my employment by 3M, I will not own, operate or render services, directly or indirectly, as an employee or consultant/advisor to, a Conflicting Organization."

*Id.*[5] Moreover, the Agreement explicitly explained that products developed by an employee while working for 3M are 3M property. *Id.*

4. The Agreement defines *"Conflicting Organization"* as:

"any person or organization which is engaged in or about to become engaged in, research on or development, production, marketing, leasing, selling or servicing of any Conflicting Product."

In addition, the agreement defines *"Conflicting Product"* as:

"any product, process, system or service of any person or organization other than 3M, in existence or under development, which is the same as or similar to or competes with, or has a usage allied to, a product, process, system or service upon which I work (in either a sales or non-sales capacity) during the last three years of my employment by 3M, or about which I acquire Confidential Information."

*Id.*

5. The Agreement defines *"Confidential Information"* in paragraph 2 as:

From December 13, 1999, through November 21, 2001, the defendant worked in the West Haven plant, where 3M was producing specialty optical fibers. *See* JF at 3. Initially, the defendant acted as Senior Manufacturing Specialist and his assignments encompassed assisting in the enhancement of the design of "fiber recipes." The defendant was also responsible for designing a new Modified Chemical Vapor Deposition ("MCVD")[6] laboratory for expanding manufacturing capacity at the West Haven plant. This expansion, which involved the design, installation, and start up of new state of the art MCVD preform manufacturing lathes, was critical to establishing enhanced fiber manufacturing capability for the 3M West Haven plant. The defendant directly and indirectly helped design the state of the art MCVD preform lathes and select supporting equipment. In the course of performing his employment duties, the defendant had access to the 3M optical fiber recipes that determine the unique and confidential characteristics of the fibers 3M manufactures for its customers.

"information, not generally known, and proprietary to 3M, including trade secret information about 3M's processes and products, including information relating to research, development, manufacture, purchasing, accounting, engineering, marketing, merchandising, selling, leasing, servicing, finance and business systems and techniques, or similar information of a third party who has entrusted such information to 3M. All information disclosed to me, or to which I obtain access, whether originated by me or by others, during the period of my employment, which I have reasonable basis to believe is Confidential Information, or which is treated by 3M as Confidential information, shall be presumed to be Confidential Information."

*Id.*

6. MCVD is one method of manufacturing optical "preforms" from which specialty optical fiber can be made.

In July, 2001, 3M launched its improvement project which was led by the defendant and designed to permit 3M to move from an outdated process for manufacturing optical fibers toward the current state of the art process. Specifically, the defendant determined startup procedures for MCVD preform manufacturing laboratory lathes to produce 3M optical fiber preforms. The defendant's intimate involvement in the expansion of the glass preform manufacturing was significant as the 3M specialty optical fiber business required expanded capacity and new machines to successfully execute the new business plan for the organization.

In the course of his work at 3M, the defendant became familiar with 3M's methods and capabilities for manufacturing specialty optical fibers, including 3M's equipment, recipes and MCVD procedures. He is also extremely familiar with the strengths and limitations of 3M's proprietary methods, including their reliability and repeatability, cost and capacity. Moreover, the defendant is also knowledgeable of 3M's customers, their product requirements and their level of satisfaction with various aspects of 3M's performance in delivering products to its customers.

StockerYale is a Massachusetts company in the process of redefining itself as a major producer of specialty optical fiber products. At the hearing, StockerYale's Vice President of Operations, James Sullivan, III, testified that StockerYale has most recently invested tens of millions of dollars in specialty optical fiber technology and related equipment. The products that StockerYale is developing are the same or similar to the products that 3M designs and manufactures in its West Haven facility. In addition, StockerYale is using MCVD technology to develop its specialty optical fiber products and is in the process of acquiring additional MCVD machines. *See* Testimony of James Sullivan.

Toward the end of the defendant's employment with 3M, the defendant submitted a resume to StockerYale. In that resume, the defendant represented that his experience with 3M included, *inter alia*, (1) working on the "procurement and implementation of $ 11 Million Dollars of state of the art manufacturing technology to support the specialty optical fiber business," and (2) "[s]upport[ing] the development and manufacturing" of specialty optical fibers. *See* JE–2. In addition, the defendant also sent StockerYale an email and attachment dated September 21, 2001, detailing the defendant's efforts and results associated with his role as a technological leader in the fields of optical fiber development and manufacturing. *See* JE–1. Defendant's description of his work also contained more specific details of his work for 3M, including his experience with the MCVD processes and MCVD equipment. *Id.* Moreover, the defendant also discussed the specific specialty optical products he worked on while he was employed at 3M. *Id.*

On or about October 31, 2001, StockerYale formally extended a job offer to the defendant to become StockerYale's Director of Manufacturing/Specialty Optical Fiber. *See* JF at 3. Thereafter, the defendant accepted StockerYale's offer by letter dated November 7, 2001. *See* JE–6. Sometime after the defendant accepted the job offer, StockerYale drafted a job description tailored to defendant's experience. Specifically, the job description stated that the defendant would (1) work closely with StockerYale's Director of Research and Development for specialty optical products; (2) "continue to deepen his understanding of the MCVD, fiber draw and characterization methods" used by StockerYale; (3) "coordinate the transfer of technology from R&D to Production"; and (4) "work closely with [research and

development] to identify critical process parameters and variables." *See* JE–11.

On November 9, 2001, the defendant notified 3M that he was resigning from 3M and that his last day would be November 23, 2001. The defendant refused to divulge any information to 3M regarding his new employer's identity. The defendant, however, informed 3M that his new employer did not compete with 3M in the same marketplace.

## B. STANDARD FOR A PRELIMINARY INJUNCTION

■ A preliminary injunction is a procedural device designed to prevent future harm, *see generally* 13 Moore's Federal Practice § 65.02(2) (Matthew Bender 3d ed.1999), and "is an extraordinary remedy which should not be granted unless the moving party has made a clear showing of entitlement to relief." *Hirschfeld v. Stone*, 193 F.R.D. 175, 185 (S.D.N.Y.2000) (internal quotation marks omitted, citations omitted). In order to demonstrate that it is entitled to relief, the party seeking the injunction must prove (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor. *See e.g., Federal Express Corp. v. Federal Espresso Inc.*, 201 F.3d 168, 173 (2d Cir.2000); *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 149 (2d Cir.1999) (citing *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir.1997)). "In ruling on an application for a preliminary injunction or temporary restraining order, the courts have taken into account the following four most important factors: (1) the significance of the threat of irreparable harm to the plaintiff if the injunction is not granted; (2) the state of the balance between the aforementioned

harm and the harm that granting the injunction would inflict on the opposing party; (3) the probability that the plaintiff will succeed on the merits; and (4) the public interest." *Phillip v. National Collegiate Athletic Ass'n*, 960 F.Supp. 552 (D.Conn. 1997) (citing 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948 (1969 & Supp.1986)).

## C. MERITS OF PLAINTIFF'S CLAIM

### 1. IRREPARABLE HARM

■ "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir.1995) (quoting *Citibank N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985)). The term "irreparable harm" "means injury for which a monetary award cannot be adequate compensation." *Jayaraj*, 66 F.3d at 39 (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)). Furthermore, "[t]he mere possibility of harm is not sufficient; the harm must be imminent and the movant must show it is likely to suffer the irreparable harm if the equitable relief is denied." *Hirschfeld v. Stone*, 193 F.R.D. 175, 185 (S.D.N.Y.2000).

■ In the present case, the defendant contends that, while he was clearly exposed to confidential information as the term is defined in the Agreement, the evidence before the court does not support 3M's contention that inadvertent disclosure of this information would irreparably harm it. *See* Df.'s Conclusions of Law at 14. The court disagrees.

It is clear that enforcement of the employment agreement, specifically the clauses prohibiting disclosure of confidential information and restricting employment, is necessary to prevent 3M from suffering irreparable harm.[7] Loss of confidential and proprietary information is not measurable in money damages. *See Computer Assoc. International, Inc. v. Bryan*, 784 F.Supp. 982, 986 (E.D.N.Y.1992). Moreover, when a high degree of similarity between an employee's former and current employment makes it *likely* that the former employer's trade secrets and other confidential and proprietary information will be used and disclosed by the employee in the course of his new work, enforcement of covenants not to compete and other similar agreements are necessary to protect against such use and disclosure. *See Branson Ultrasonics Corp. v. Stratman*, 921 F.Supp. 909, 913 (D.Conn.1996); *Continental Group, · Inc. v. Kinsley*, 422 F.Supp. 838, 844–45 (D.Conn.1976). Here, the evidence demonstrates that Stocker-Yale is in the process of manufacturing the same or very similar types of optical fiber as those manufactured by 3M. The defendant has vast knowledge of 3M's optical fiber business, including 3M's confidential specialty optical fiber design "recipes" and potentially proprietary manufacturing processes.[8] An employee, such as the defendant, working in the same field on the same product, even with the utmost good faith, cannot be expected to compartmentalize his knowledge so his decisions and disclosures are not tainted by information he is prohibited from using: *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). Therefore, the court concludes that 3M will suffer irreparable harm if the defendant is employed at StockerYale.

### 2. Likelihood of Success on the Merits

#### a. Validity of the restriction

It is the general rule that competent persons shall have the utmost liberty of contracting and that their agreements, voluntarily and fairly made, shall be held valid and enforced in the courts. *Collins v. Sears, Roebuck & Co.*, 164 Conn. 369, 377, 321 A.2d 444 (1973). However, it has long been the law that "if the contract contemplates acts against public policy, or forbidden by statute, it is inoperative." *Smith v. Delaney*, 64 Conn. 264, 276, 29 A. 496 (1894). In cases such as the present, the public policy exception to the liberty of contract is implicated because

---

7. In its Findings of Facts and Conclusions of Law in Support of its Motion for Preliminary Injunction, 3M states:

 In the case of a restrictive covenant in an employment relationship, proof of irreparable harm is not required because "irreparable harm will invariably result from a violation of the defendant's promises." *Gartner Group, Inc. v. Mewes*, 1992 WL 4766 at *2 (Conn.Super.1992). Accordingly, a "restrictive covenant may be enforced by injunction without a showing that violation of the covenant will cause harm to the plaintiff, so long as such relief is not inequitable." *Hartford Elec. Light Co. v. Levitz*, 173 Conn. 15, 19–22, 376 A.2d 381 (1977).

 See Plaintiff's Conclusions of Law at 18. Although the court acknowledges this authority, based upon the evidence and testimony introduced at the hearing, the court makes an explicit finding of irreparable harm to 3M.

8. Wholly apart from specific secrets concerning its process, 3M is entitled to protection against disclosure to its competitor of the stage of its product development. With a limited number of companies competing to be among the first to develop a new specialty optical product with potentially enormous sales and profits, information concerning one company's proximity to success would have considerable value to competitors faced with important decisions as to the rate at which their own development should or should not proceed. *See Continental Group, Inc., supra*, 422 F.Supp. at 845.

The public have an interest in every person's carrying on his trade freely; so has the individual. All interference with individual liberty of action in trading, and all restraints of trade of themselves, if there is nothing more, are contrary to public policy, and therefore void. That is the general rule. But there are exceptions: restraints of trade and interference with individual liberty of action may be justified by the special circumstances of a particular case. It is a sufficient justification, and, indeed, it is the only justification [in the absence of statute], if the restriction is reasonable—reasonable, that is, in reference to the interests of the parties concerned, and reasonable in reference to the interests of the public, so framed and so guarded as to afford adequate protection to the party in whose favor it is imposed, while at the same time it is in no way injurious to the public.

*Samuel Stores, Inc. v. Abrams,* 94 Conn. 248, 252, 108 A. 541 (1919).

█ Thus, a covenant that restricts the activities of an employee following the termination of his employment is valid and enforceable if the restraint is reasonable. *Scott v. General Iron & Welding Co.,* 171 Conn. 132, 137, 368 A.2d 111 (1976); *New Haven Tobacco Co. v. Perrelli,* 18 Conn. App. 531, 533, 559 A.2d 715 (1989). "The five factors to be considered in evaluating the reasonableness of a restrictive covenant ancillary to an employment agreement are: (1) the length of time the restriction operates; (2) the geographic area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests. *Scott v. General Iron & Welding Co.,* 171 Conn. 132, 137, 368 A.2d 111 (1976); *New Haven Tobacco Co. v. Perrelli,* 11 Conn.App. 636, 638–39, 528 A.2d 865 (1987)." *Robert S. Weiss & Associates,*

*Inc. v. Wiederlight,* 208 Conn. 525, 529 n. 2, 546 A.2d 216 (1988). "The five prong test of *Scott* is disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable." *New Haven Tobacco Co. v. Perrelli, supra,* 534, 559 A.2d 715.

█ In the present case, the covenant not to compete contained in the Agreement was knowingly entered into by the defendant for adequate consideration. While the court acknowledges that an injunction to bar competitive employment is a more severe remedy than an injunction to bar disclosure of the former employer's trade secrets, in some circumstances, such as the present, it is an entirely appropriate and necessary remedy because of the conscious choices both the employer and employee made when the covenant was executed. Here, 3M decided it would give the defendant access to confidential information concerning 3M's product development. If the defendant preferred not to give the covenant, 3M could have chosen not to hire him. Similarly, the defendant decided to accept the opportunity to be involved in 3M's sensitive and confidential product development work and signed the Agreement which he understood was a requirement of having that opportunity for work of a specialized nature. If the defendant preferred not to be bound by the Agreement, he could have declined the opportunity for the specialized work at 3M. While these considerations would not warrant enforcement of covenants in situations where doing so would be unreasonable, they do provide justification for enforcement of otherwise reasonable covenants to protect against disclosure of all confidential information concerning the employer's development of a new product, including some confidential information that might not technically qualify for trade secret protec-

tion. *See Continental Group, Inc. v. Kinsley,* 422 F.Supp. 838, 844–45 (D.Conn. 1976).

The covenant is reasonable considering the above-mentioned five factors and, therefore, valid under Connecticut law.

### (i). Time

 The defendant contends that the two-year time limit in the non-competition provision of the Agreement is not reasonable under the facts and circumstances of this case because the 3M does not have a legitimate business interest. The court is unpersuaded.

3M clearly has a legitimate business interest in seeking that the defendant does not disclose its confidential and proprietary information to a competitor. The length of time that the Agreement restricts the defendant under the facts and circumstances of the case is reasonable. The Agreement prohibits the defendant from working for a conflicting employer for a two-year period following the termination of his employment with 3M.[9] Connecticut courts and elsewhere have held that restraints for two years are reasonable. *See, e.g., Robert S. Weiss,* 208 Conn. 525, 546 A.2d 216 (1988). Here, the two year limitation fairly protects 3M's interests in the specialty optical fiber industry while ensuring the defendant that he could return to this field within a definite and reasonable period of time. In addition, although the defendant had previous experience in fiber optics, the defendant gained new knowledge and invaluable experience through his employment at 3M. The length of restriction is both reasonable and necessary to protect that information.

### (ii.) Geography

The defendant maintains that the geographic restriction of the Agreement is not reasonable because it is not narrowly drawn. 3M, however, responds that the restriction is narrowly tailored to suit its business operations. The court agrees with 3M.

 The geographic scope of the restriction is not overly broad in light of 3M's domestic and international market. Although the restriction offers 3M global protection,[10] the restriction is narrowly tailored to protect 3M only in the geographic areas where it does business. Such a restriction is reasonable in view of 3M's business situation and, by its own terms, does not protect 3M in areas where it does not conduct business. Moreover, it is likely that the defendant could even work in those locations where 3M does business, provided that the products or services that the defendant renders do not conflict with those of 3M.

### (iii.) Protection to the employer

 "In order to be valid and binding, a covenant which restricts the activities of an employee following the termination of his employment ... should afford only a fair protection to the interest of the party in whose favor it is made." *Scott v. General Iron & Welding Co., supra,* 171 Conn. at 137, 368 A.2d 111. "[W]hen the character of the business and the nature of employment are such that the employer requires protection for his established business against competitive activities by one who has become familiar with it

---

9. The agreement, however, does provide an exception allowing the defendant to work for a conflicting business if the defendant is not rendering services for a conflicting product as defined by the Agreement.

10. The Agreement actually prohibits the defendant from competing with 3M by accepting employment with a "Conflicting Organization" in the United States or in any country in which 3M has a plant for manufacturing a product or provides a service that the defendant was involved with while at 3M.

through employment therein, restrictions are valid when they appear to be reasonably necessary for the fair protection of the employer's business or rights."

▆▆▆ The Agreement provides a reasonable degree of protection to 3M. 3M has invested a large amount of capital to developing its West Haven plant, including improving the processes of manufacturing specialty optical fiber products. As established by 3M, the defendant has been integral in this process. Thus, the level of protection that the restriction affords to 3M is reasonably necessary to protect the business rights of 3M.

### (iv.) Interference with the employee's employment

▆▆▆ The defendant argues, *inter alia*, that "here is a high probability that if [he] is sidelined from the fast-paced, constantly evolving [specialty optical fiber] industry for two years, his future employability in his chosen field would be irreparably harmed." *See* Defendant's Post Submission Brief (hereinafter "Df.'s Post Brief") at 26. The defendant's argument is speculative at best and is not supported by the existing law.

▆▆▆ "The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from supporting himself and his family." *Scott v. General Iron & Welding Co., supra,* 171 Conn. at 137, 368 A.2d 111. Here, the restriction interferes, albeit reasonably, with the defendant's employment. The covenant does not force the defendant to sacrifice his livelihood. For example, the restrictive covenant does not attempt to prohibit the defendant from working for an organization that is not a competitor, or even working for a competitor with prior approval, so long as he is not working on a conflicting product. Moreover, after two

years, the defendant can return to work in any capacity for any competitor of 3M.

In addition, the court notes that the compensation provision of the Agreement undeniably affords reasonable protection to the defendant. The provision provides that if the defendant is unable to find employment consistent with his abilities and education solely because of the noncompete provisions of the Agreement, 3M will continue to pay him at his base salary rate for the two-year term of the competition bar, provided that the defendant makes bona fide efforts to find such employment. Accordingly, the defendant will not be financially harmed by the enforcement of the agreement.

### (v.) Public interest

Lastly, the defendant contends that enforcing the Agreement will violate the public interest because:

> an emerging key player in the [specialty optical fiber] marketplace, [Stocker-Yale], stands to be damaged if the preliminary injunction is granted. Ultimately, the loss will be borne by the end users—the public—who will in all likelihood be deprived of the fruits of [the defendant's] highly specialized skills and knowledge for a 2–year period.

*See* Df.'s Post Brief at 27. The defendant's contention is without merit.

▆▆▆ Instead, the court finds that affording 3M protection under the Agreement does not violate the public interest. In particular, as stated by 3M, the covenant does not prevent 3M's competitors from continuing their operations. No evidence was presented by the defendant that the agreement will have an impact on competition that would be adverse to the public's interest. In fact, James Sullivan testified that StockerYale has already found a replacement for the defendant if the defendant was unable to work for StockerYale.

*See* Testimony of James Sullivan. Thus, the court's enforcement of the Agreement will not harm the public interest.

### b. Breach of the 3M Agreement

In addition to finding that a valid agreement exists in the present case, the Court also finds that 3M would likely succeed in establishing a breach of the Agreement by the defendant if he is indeed employed by StockerYale. At the hearing, the defendant appeared to argue that, in order for the court to enforce the non-competition covenant, 3M's secrets must be shown to have ready application in the work being done by StockerYale. The court is not persuaded.

Non-competition covenants are enforceable to the extent they are reasonably necessary to prevent use or "disclosure" of the former employer's secrets. *See, e.g., Continental Group, Inc. v. Kinsley,* 422 F.Supp. 838 (D.Conn.1976). Here, StockerYale's work is sufficiently similar to that of 3M to create a strong presumption that disclosure will occur in the course of the defendant's employment with StockerYale. The mere performance of the service that the defendant would perform at StockerYale would almost necessarily impart such knowledge that he had acquired from 3M to some degree detrimental to 3M. *See, e.g., Continental Group, Inc., supra.*

### 3. Other Considerations

Though the issues need not be reached, the court finds that (1) the significance of the threat of irreparable harm to the plaintiff if the injunction is not granted is substantial and (2) the balance of hardships between the plaintiff and the defendant tips decidedly in favor of 3M. If the covenant is not enforced, it is likely that 3M will lose the benefit of its trade secrets and other proprietary information concerning its specialty optical fiber business. In addition, 3M will have no adequate remedy at law. If the covenant is enforced, the defendant will not be able to work at StockerYale for the balance of the two year term set forth in the Agreement. The court notes that interfering with the defendant's employment in this way is a serious matter. However, the Agreement is equitable in the sense that 3M will pay the defendant if he is unable to obtain permanent employment elsewhere. In addition, if the defendant is unable to get other employment, there is no evidence that he will not be able to resume working for 3M. In fact, at the hearing 3M's Business Director for Optical Components, Susan Nestegard, testified that the defendant would be able to return to his job with 3M. Lastly, the court notes that the defendant's background and skills should enable the defendant to find employment in fields related to the optical fiber industry that does not conflict with the Agreement.

### 4. Bond

Rule 65(c) of the Federal Rules of Civil Procedure provides that preliminary injunctions ordinarily should be issued only upon the giving of a bond or other security. However, the court, having considered the issue of bond, determines that the providing of one is not warranted in this case.

### III. CONCLUSION

For the aforementioned reasons, the motion for preliminary injunction (**Doc. # 4**) should be **GRANTED**.

**IT IS SO ORDERED.**