278 P.3d 197 (2012)
Robert S. MOORE, Appellant,
v.
COMMERCIAL AIRCRAFT INTERIORS, LLC, and Jerry Welch, Individually and as President and Chief Executive Officer of Commercial Aircraft Interiors, LLC, Respondents.
No. 66279-1-I.
Court of Appeals of Washington, Division 1.
May 29, 2012.
*198 Kelby D. Fletcher, Stokes Lawrence, Seattle, WA, for Appellant.
Don P. Badgley, Badgley Mullins Law Group PLLC, Seattle, WA, for Respondents.
BECKER, J.
¶ 1 Robert Moore appeals a grant of summary judgment in favor of his former employer, Commercial Aircraft Interiors LLC, and its owner, Jerry Welch. Moore claimed they tortiously interfered with his expectation of employment and blacklisted him. We affirm the order of dismissal.

FACTS
¶ 2 Jerry Welch founded International Aero Interiors LLC (IAI), located in Skagit County. In 2003, Welch left IAI to form Commercial Aircraft Interiors LLC (CAI), also in Skagit County. Appellant Robert Moore worked under Welch at IAI as vice president of sales and marketing. In March 2004, Welch hired Moore to serve in the same role at CAI. IAI is now known as Volant Aerospace Holdings LLC. CAI and Volant are competitors in the aircraft interior refurbishment business.
¶ 3 In February 2005, CAI required Moore to sign a document acknowledging that he understood and agreed to abide by CAI's "policy of non-disclosure of any and all company policies, trade secrets, intellectual properties, and customer contacts to outside entities or persons." Moore was asked to sign a second nondisclosure agreement in August 2008. Moore resigned from his position at CAI later in August or September 2008.
¶ 4 In October 2008, Volant expressed interest in purchasing CAI. Volant and CAI hired Moore to serve as an independent consultant to assist them in negotiating the acquisition. Moore signed consulting contracts with both companies that prohibited him from divulging the companies' trade secrets, financial data, and other know-how to third parties.
¶ 5 The negotiation was unsuccessful. In March 2009, Moore was rehired by CAI in his former role as vice president of sales and marketing. Several months later, in August 2009, Moore was laid off in a general reduction of force.
¶ 6 Moore was not asked to sign a noncompete covenant or other postemployment restraint at any of the times he entered or left CAI's employment. CAI explained in interrogatory answers that it did not seek such a covenant because "Moore had worked for CAI and with Jerry Welch for many years so a level of trust had been developed."
¶ 7 After being laid off by CAI, Moore looked to Volant for employment. Volant agreed to hire Moore. Before finalizing the hire, however, Volant president Ian Rollo sent a letter to Welch. Rollo related Volant's *199 interest in hiring Moore and asked Welch to agree that CAI had no objection to Moore working for Volant. Rollo's letter stated:
Mr. Moore has requested that Volant extend an offer of employment to him and Volant has agreed to do so, but only if said offer of employment does not violate any non-compete or other restrictive covenants existing between Mr. Moore and CAI.
... I am requesting that you acknowledge and agree on behalf of CAI that Volant's offer of employment to Mr. Moore is not objectionable to CAI and will not violate any agreement to which Mr. Moore may be a party in favor of CAI.
¶ 8 Through counsel, CAI objected. CAI's letter explained that Volant's plan to employ Moore would necessarily result in Moore's disclosure of CAI's trade secrets and other confidential information to Volant:
As you are aware, Mr. Moore has a long employment relationship with CAI and is intimately familiar with all aspects of the business of CAI, including its confidential information, practices, finances, employees, customers, and trade secrets. Mr. Moore's consulting agreement with CAI... acknowledges that all trade secrets and know-how of the Parties are confidential and the sole Property of the Parties.
Employment of Mr. Moore by Volant in any capacity; as consultant, employee, independent contractor or otherwise would necessarily result in his breach of his common law duty not to violate his position of trust and confidence with CAI inasmuch as the companies are competitors and Mr. Moore could not avoid the use of or disregard the infinite knowledge he possesses of CAI confidential information and trade secrets. Such employment would constitute actionable unfair competition by Volant. If Mr. Moore is employed by Volant, CAI will institute legal action to protect its confidential information and trade secrets and to prohibit the unfair competition by Volant that would result from such employment.
¶ 9 Moore responded through counsel to CAI's letter. Moore asserted that CAI held no covenant restricting Moore's ability to work for competitors, and moreover, CAI possessed no confidential information or trade secrets that it had not already shared with Volant by means of the recent negotiation and due diligence process.
¶ 10 After receiving CAI's letter, Volant did not hire Moore. In January 2010, Volant wrote to Moore and expressed its continued interest in hiring him, subject to "CAI releasing both you and Volant of any potential liability related [to] your hiring."
¶ 11 On March 2, 2010, Moore sued CAI and Welch (collectively CAI) claiming that they had unlawfully interfered with his prospects of employment with Volant and had also violated RCW 49.44.010, a statute that imposes criminal penalties for "wilfully and maliciously" blacklisting a worker. In answer, CAI joined Volant as a third party defendant and asserted counterclaims against Moore and Volant, including breach of contract, misappropriation of trade secrets, conversion, and negligent misrepresentation.
¶ 12 CAI and Moore filed cross motions for summary judgment. The court granted CAI's motion and dismissed Moore's suit. The court found Moore had produced no evidence that CAI acted in bad faith or with malice, while CAI had produced evidence to show its letter was an assertion of "a legally protected interest in maintaining its trade secrets from disclosure." This appeal followed.

TORTIOUS INTERFERENCE
¶ 13 This court reviews summary judgment orders de novo, engaging in the same inquiry as the trial court. Cornish Coll. of the Arts v. 1000 Virginia Ltd. P'ship, 158 Wash.App. 203, 216, 242 P.3d 1 (2010), review denied, 171 Wash.2d 1014, 249 P.3d 1029 (2011). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). If the plaintiff fails to make out a prima facie case on the essential elements of his claim, summary judgment for the defendant is appropriate because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *200 Boguch v. Landover Corp., 153 Wash. App. 595, 609, 224 P.3d 795 (2009). We construe the evidence and inferences from the evidence in favor of the nonmoving party. Cornish Coll., 158 Wash.App. at 216, 242 P.3d 1.

Plaintiff's Case
¶ 14 To prevail on a claim of tortious interference with a business expectancy, a plaintiff must prove five elements:
(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.
Leingang v. Pierce County Med. Bureau, Inc., 131 Wash.2d 133, 157, 930 P.2d 288 (1997). In this case, only the fourth element is in dispute.
¶ 15 The allocation of burdens on this element was once unclear. See Brief of Appellant at 15, citing RESTATEMENT (SECOND) OF TORTS ch. 37 introductory note (1979) (commenting that there existed "considerable disagreement on who has the burden of pleading and proving certain matters" in tortious interference cases). But our Supreme Court definitively added the element of improper purpose or means to the plaintiff's prima facie burden in Pleas v. City of Seattle, 112 Wash.2d 794, 804, 774 P.2d 1158 (1989). Only after the plaintiff establishes the five elements of the tort does the burden shift to the defendant to show, as an affirmative defense, that its interference was either privileged or justified. Pleas, 112 Wash.2d at 805, 774 P.2d 1158; see also Commodore v. Univ. Mech. Contractors, Inc., 120 Wash.2d 120, 137, 839 P.2d 314 (1992).
¶ 16 Moore asserts that the very fact that CAI opposed his employment with Volant raises an inference that satisfies the fourth element. Interference alone is not enough. Threatened lawsuits may constitute an interference by improper means only where the interferor "has no belief in the merit of the litigation" or threatens litigation "only to harass the third parties and not to bring his claim to definitive adjudication." RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (1979); see also 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 352.03, at 433 (5th ed. 2005). Threatened lawsuits may constitute an interference for an improper purpose if, for example, the interferor is acting out of ill will, greed, retaliation, or hostility or is motivated by an intent to harm the plaintiff. RESTATEMENT (SECOND) OF TORTS § 767, cmt. d (1979); see also Elcon Const. Inc. v. E. Wash. Univ., ___ Wash.2d ___, 273 P.3d 965, 971 (2012); WPI 352.03 (5th ed. 2005).
¶ 17 Moore argues that CAI failed to prove that it threatened litigation in good faith. That argument shifts the burden of proof in the prima facie case. To survive the motion to dismiss, Moore had the burden to prove CAI acted in bad faith. None of the statements in Moore's two sworn declarations raise a reasonable inference of bad faith, ill will, intent to harass, or other improper means or purposes on the part of CAI. Nor does he provide any document or other evidence raising any such inference, either explicitly or implicitly. Moore claims that certain allegations in CAI's counterclaim reveal that CAI was hostile to Moore. Allegations in a counterclaim do not satisfy Moore's evidentiary burden on summary judgment. Pleadings are not evidence. Joseph v. Schwartz, 128 Wash. 634, 636, 224 P. 5 (1924).
¶ 18 To be improper, interference must be wrongful by some measure beyond the fact of the interference itself, such as a statute, regulation, recognized rule of common law, or an established standard of trade or profession. Pleas, 112 Wash.2d at 803-04, 774 P.2d 1158. Moore argues that the blacklisting statute, RCW 49.44.010, provides such a standard by making it unlawful to act deliberately to prevent someone from obtaining employment. That statute prohibits employers from "wilfully and maliciously" seeking to influence a potential employer against hiring a worker. RCW 49.44.010 (emphasis added). To satisfy a showing *201 based on this statute, Moore must provide evidence of malice, which he has not done.
¶ 19 The Supreme Court's recent decision in Elcon supports the trial court's decision here. In Elcon, the defendant, Eastern Washington University, sent a letter to the plaintiff construction company's bond surety, informing the surety that it had issued the plaintiff a termination for cause letter and that it held a potential claim against the bond for the construction company's deficient work. Elcon, 273 P.3d at 971-72. The construction company sued Eastern for tortious interference, alleging that the letter to the bond surety had impaired the company's bonding capacity. The court affirmed dismissal of the claim, concluding that Eastern's letter did not show an improper purpose:
More importantly, by itself, the letter does not show improper purpose. And Elcon, by merely labeling the letter as "intentional and vindictive," has not met its burden of showing such a purpose. If Eastern was motivated by greed, retaliation, or hostility in sending a copy of the termination letter to Elcon's surety, Elcon has failed to show such a motive. Conclusory statements and speculation will not preclude a grant of summary judgment. Elcon claimed to have suffered damage as a result of its surety having knowledge of Eastern's attempted conversion, but absent a showing that Eastern acted with an improper purpose, no genuine issues of material fact exist.
Elcon, 273 P.3d at 971-72 (footnote and citations omitted). Applying the same reasoning here, we conclude Moore has failed to provide evidence, beyond conclusory statements and speculation, that CAI wrote its letter for an improper purpose. Because that showing was absent, the trial court properly dismissed the case on summary judgment.

Affirmative Defense
¶ 20 Dismissal was also properly granted on the alternative basis of CAI's affirmative defense. Even if Moore had established all five elements of his prima facie case, CAI established the affirmative defense of a good faith belief that Moore's employment posed a genuine threat to its trade secrets. Such a showing, where unrebutted, is dispositive under Brown v. Safeway Stores, Inc., 94 Wash.2d 359, 617 P.2d 704 (1980). A person is not guilty of tortious interference when the person "`in good faith asserts a legally protected interest of his own, which he believes may be impaired by the performance of a proposed transaction.'" Brown, 94 Wash.2d at 375, 617 P.2d 704, quoting Singer Credit Corp. v. Mercer Island Masonry, Inc., 13 Wash.App. 877, 884, 538 P.2d 544 (1975). Exercising in good faith one's legal interests is not improper interference. Elcon, 273 P.3d at 971; Leingang, 131 Wash.2d at 157, 930 P.2d 288.
¶ 21 CAI made out an affirmative showing of a legally protected interest that it believed might be impaired if Moore obtained employment with Volant. CAI submitted copies of three separate agreements previously signed by Moore in which he made binding promises not to use or disclose CAI's trade secrets. Welch's sworn declaration stated that CAI possessed trade secrets not shared with Volant during negotiations, of which Moore had knowledge during his employment, including detailed bidding formulae for CAI's machine and wire shops that CAI "spent three years developing and refining." Although a noncompete covenant did not exist in this case, CAI was in possession of nondisclosure agreements from Moore and was entitled to threaten suit in good faith to protect the interests identified in those agreements.
¶ 22 Moore contends that CAI's assertion of a legally protected interest was not made in good faith because it relied upon the "inevitable disclosure doctrine." In some jurisdictions, a plaintiff in a trade secrets case may obtain an injunction preventing an employee from going to work for a competitor by demonstrating that the employee would inevitably disclose the former employer's confidential or trade secret information. PepsiCo, Inc. v. Redmond, 54 F.3d 1262 (7th Cir.1995); see generally 36 A.L.R.6th 537, "Applicability of Inevitable Disclosure Doctrine Barring Employment of Competitor's Former Employee." Some cases reject the inevitable disclosure doctrine entirely, perceiving that it undermines public policy favoring employee mobility. See Whyte v. Schlage Lock Co., 101 *202 Cal.App.4th 1443, 1461-64, 125 Cal.Rptr.2d 277 (2002) (criticizing inevitable disclosure doctrine because its application would transform a confidentiality agreement into an unbargainedfor and uncompensated noncompete agreement). Washington courts have neither adopted nor rejected the inevitable disclosure doctrine, and we make no decision whether it should be adopted or rejected. This is a tortious interference case, not a trade secrets case or a suit for an injunction, so a ruling adopting or rejecting the doctrine is not required.
¶ 23 Moore contends that even if Washington law expressly permitted an employer to assert the inevitable disclosure doctrine, CAI could not obtain an injunction barring Moore's employment with Volant because there is no evidence of dishonesty or misconduct by Moore and hence no reason to believe he would violate his confidentiality agreement. Without concrete evidence that the employee is likely to disclose trade secrets, Moore contends, an employer's petition for an injunction must necessarily be denied. He cites PepsiCo, in which the employee's "lack of forthrightness" caused the trial court to conclude there was a genuine danger that he would disclose trade secrets. PepsiCo, 54 F.3d at 1267. The appellate court weighed the employee's lack of trustworthiness in deciding to affirm the injunction:
Thus, when we couple the demonstrated inevitability that Redmond would rely on [PepsiCo] trade secrets in his new job at Quaker with the district court's reluctance to believe that Redmond would refrain from disclosing these secrets in his new position (or that Quaker would ensure Redmond did not disclose them), we conclude that the district court correctly decided that PepsiCo demonstrated a likelihood of success on its statutory claim of trade secret misappropriation.
PepsiCo, 54 F.3d at 1271.
¶ 24 PepsiCo does not support Moore's claim that evidence of some affirmative misconduct by the employee must be shown before the inevitable disclosure doctrine can be employed. Citing PepsiCo, another court granted a preliminary injunction based on the inevitable disclosure doctrine and said, "An employee, such as the defendant, working in the same field on the same product, even with the utmost good faith, cannot be expected to compartmentalize his knowledge so his decisions and disclosures are not tainted by information he is prohibited from using." Minn. Mining & Mfg. Co. v. Francavilla, 191 F.Supp.2d 270, 278 (D.Conn.2002) (emphasis added). So it appears that where the inevitable disclosure doctrine is employed, the danger of unconscious disclosure of trade secrets may support an injunction even if there is no reason to suspect disclosure will be intentional.
¶ 25 A party is entitled to assert in good faith "an arguable interpretation of existing law" without fear of becoming liable for tortious interference. Leingang, 131 Wash.2d at 157, 930 P.2d 288. As the trial court correctly reasoned, the inevitable disclosure theory was available to CAI as an arguable interpretation of existing law. CAI was entitled to argue in good faith that Moore could be enjoined from working for Volant on the basis of inevitable disclosure of CAI's trade secrets without proof that Moore was untrustworthy.
¶ 26 Moore claims that by threatening Volant with litigation if it hires him, CAI has obtained a remedy more extreme than it could have obtained from a court. See Sheppard v. Blackstock Lumber Co., Inc., 85 Wash.2d 929, 932-33, 540 P.2d 1373 (1975) (covenant not to compete may be enforced if reasonable; duration is a significant consideration). Moore contends the dismissal of his case unreasonably provides CAI with the equivalent of a permanent injunction preventing him from ever working for Volant.
¶ 27 No injunction has been sought or issued. Whether or not to hire Moore is a decision that remains with Volant. CAI's objection to Volant's desire to hire Moore does put Moore in a difficult position. Nevertheless, his claim of tortious interference lacks an adequate evidentiary showing, and therefore may not proceed to trial.
¶ 28 In summary, no evidence in the record shows that CAI threatened litigation without believing in the merits of its claim or based on a desire to harass or cause harm to Moore *203 or Volant. In addition, CAI presented unrebutted evidence supporting its affirmative defense of a legally protected interest asserted in good faith. Summary judgment dismissing Moore's tortious interference claim was properly granted.

BLACKLISTING
¶ 29 Moore's second claim is that CAI's letter to Volant violated Washington's blacklisting statute, RCW 49.44.010. The statute makes it a criminal offense to "wilfully and maliciously make or issue any statement or paper that will tend to influence or prejudice the mind of any employer against the person of such person seeking employment." RCW 49.44.010. The statute was enacted in 1899 to prevent railroad unionbusting. Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 184 & n. 2, 61 S.Ct. 845, 85 L.Ed. 1271 (1941) (citing predecessor statute). The statute is relevant here, Moore argues, because CAI "wilfully and maliciously" wrote a letter that influenced Volant against hiring him.
¶ 30 Raising a threshold issue, CAI contends the statute does not provide Moore a civil cause of action. We disagree. Although the parties do not cite the case, the Supreme Court decades ago unambiguously found that an earlier version of the statute created a civil right of action:
We think it must be conceded that the violation of our statute, Rem. & Bal.Code, § 6565 (P.C. 291 § 159), though specifically punishable only by criminal prosecution, is a sufficient basis for a civil action in favor of the person injured. This is a general rule as to the violation of criminal statutes resulting in specific injury to particular persons.
Dick v. N. Pac. Ry. Co., 86 Wash. 211, 221, 150 P. 8 (1915). Dick remains good law, and it allows a civil cause of action for blacklisting.
¶ 31 Moore nevertheless fails to meet his evidentiary burden. He has failed to present any evidence of malice on the part of CAI. On the contrary, he has declared that he shared a trusting relationship with CAI. CAI rehired Moore into his position as vice president even after the acquisition negotiations failed. CAI laid him off five months later as part of a general reduction of force. The record presents no reasonable inference of malice on the part of CAI. Summary judgment dismissing the blacklisting claim was properly granted.
¶ 32 Affirmed.
WE CONCUR: DWYER and ELLINGTON, JJ.